110 N.J. 69 (1988)
539 A.2d 1181
IN THE MATTER OF THE DIRECTIVE OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, ISSUED TO KIMBER PETROLEUM CORPORATION, SHELL OIL COMPANY AND SOLAR OIL COMPANY.
The Supreme Court of New Jersey.
Argued November 18, 1986.
Decided April 18, 1988.
*71 Edwin R. Matthews and Edward J. Farrell argued the cause for appellants, Kimber Petroleum and Solar Oil Company (Budd, Larner, Gross, Picillo, Rosenbaum, Greenberg & Sade, attorneys for Kimber Petroleum Corporation, and Farrell, Curtis, Carlin & Davidson, attorneys for Solar Oil Company; Edwin R. Matthews, Edward J. Farrell, John D. O'Dwyer and Nancy Giacumbo, on the briefs).
Ross A. Lewin, Deputy Attorney General, argued the cause for respondent, Department of Environmental Protection (W. Cary Edwards, Attorney General of New Jersey, attorney; James J. Ciancia, Assistant Attorney General, and Michael R. Clancy, Deputy Attorney General, of counsel; Ross A. Lewin and John A. Covino, Deputy Attorneys General, on the briefs).
James W. Christie submitted a brief on behalf of amicus curiae, Township of Gloucester (Griffith, Burr, Angelini & Viniar, attorneys).
*72 William H. Hyatt, Jr. and William J. Friedman submitted a brief on behalf of amici curiae, Woodland Study Group, Minnesota Mining and Manufacturing Company and Rohm and Haas Company (Pitney, Hardin, Kipp & Szuch, attorneys).
The opinion of the Court was delivered by HANDLER, J.
In 1984, the Department of Environmental Protection (DEP) investigated the source of a serious groundwater contamination in the Township of West Milford. The contamination was traced to an Amoco gasoline station leased by Kimber Petroleum Corporation and a Chevron gasoline station owned by Solar Oil Sussex at the time of the contamination. The groundwater contamination required residents of the Greenbrook Estates neighborhood to be connected to an outside water supply. Acting pursuant to the New Jersey Spill Compensation and Control Act, DEP directed Kimber Petroleum and Solar Oil to pay $2.16 million to fund the construction of an alternate water supply, failing which each would be subjected to treble damages. Kimber Petroleum and Solar Oil resisted payment of these costs, appealed to the Appellate Division, and moved for a stay of DEP's order exacting costs and imposing treble damages upon a refusal to pay. On July 31, 1986, the Appellate Division denied the motion for a stay pending appeal. On October 20, 1986, the Court certified the appeal pursuant to Rule 2:12-2 and ordered appellants to pay or to post security for the claimed costs of the removal but enjoined the imposition of treble damages.

I.
Kimber Petroleum and Solar Oil challenge the constitutionality of the New Jersey Spill Compensation and Control Act (the Spill Act), N.J.S.A. 58:10-23.11 to -23.11z. In particular, they assert that the Spill Act's treble damages provision violates the *73 parties' due process rights under the federal and state constitutions.
The treble damages section of the Spill Act is as follows:
Whenever any hazardous substance is discharged, the [Department of Environmental Protection] may, in its discretion act to remove or arrange for the removal of such discharge or may direct the discharger to remove, or arrange for the removal of, such discharge.... Any discharger who fails to comply with such a directive shall be liable to the department in an amount equal to three times the cost of such removal ... [N.J.S.A. 58:10-23.11f(a).]
The following section deals with the polluter's liability:
Any person who has discharged a hazardous substance or is in any way responsible for any hazardous substance which the department has removed or is removing ... shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs.
An act or omission caused solely by war, sabotage, or God, or a combination thereof, shall be the only defenses which may be raised by any owner or operator of a major facility or vessel responsible for a discharge in any action arising under the provisions of this act. [N.J.S.A. 58:10-23.11g(c), (d).]
Thus under these provisions a "discharger" is one who has "discharged a hazardous substance or is in any way responsible" for such a discharge. Id. The liability of a discharger is absolute  it is strict, "without regard to fault", and joint and several; only limited defenses not associated with fault  i.e., relating to war, sabotage or divine factors  are available. Id. See State, Dep't of Envtl. Protection v. Ventron Corp., 94 N.J. 473, 501-03 (1983) (liability under the Spill Act extends to parent corporation of wholly owned subsidiary that violated the Spill Act).

II.
At the outset we point out that DEP, in issuing the directives in this case, has not been acting within the language of the Spill Act as strictly interpreted. The Act directly authorizes DEP to take one of two alternative actions when it discovers illegally-dumped hazardous waste: 1) it can act to remove the waste (and then bring a cost-recovery action against the responsible parties, N.J.S.A. 58:10-23.11q), or 2) it can direct a responsible party to remove the waste. N.J.S.A. 58:10-23.11g(c), (d). In this case, DEP has done neither. DEP's *74 directive to Kimber Petroleum and Solar Oil required Kimber Petroleum to pay the money necessary for the work DEP intended to undertake in the construction of an alternative water supply required by the local groundwater contamination. DEP did not seek relief by way of a cost-recovery action nor did it direct Kimber Petroleum and Solar Oil to do the work. This raises as a threshold question the validity of DEP's action in this case as a basis for treble damages. Though this issue was not fully raised by the parties, we believe it appropriate to deal with it at this time.
DEP's practice of requiring payment by responsible parties while maintaining control itself over remedial actions is not directly authorized by the Spill Act.[1] Nevertheless, DEP's ability directly to undertake removal of a discharge, thereby assuring the elimination of toxic contamination while concomitantly securing removal costs from responsible parties, would appear to be highly necessary as a means of effective enforcement of the Spill Act. DEP has the discretion, implicit in its broad implied powers, to require responsible polluters to pay for cleanup or removal costs prior to remedial action.[2]See New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544 (1978); cf. GATX Terminals Corp. v. State, Dep't of Envtl. *75 Protection, 86 N.J. 46, 52 (1981) (statutory power to clean up spills provides basis to prevent spills). We are satisfied that the practice is implicit in the broad authority granted the Department under the Spill Act and under the Department's own authorizing legislation, N.J.S.A. 13:1D-1 to -19.

III.
The United States Supreme Court has upheld the validity under the federal constitution of multiple damages provisions. Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 584, 62 S.Ct. 1216, 1223, 86 L.Ed. 1682, 1691 (1942); Missouri Pac. Ry. Co. v. Tucker, 230 U.S. 340, 348-49, 33 S.Ct. 961, 962-63, 57 L.Ed. 1507, 1510 (1913); Missouri Pac. Ry. Co. v. Humes, 115 U.S. 512, 523, 6 S.Ct. 110, 114, 29 L.Ed. 463, 466 (1885). The Supreme Court regularly applies antitrust legislation, which, like the Spill Act, combines treble damages with joint and several liability. See, e.g., Texas Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981); Cantor v. Detroit Edison Co., 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). The Sherman Antitrust Act has been interpreted in a way that those subjected to onerous joint and several liability provisions have no right of contribution. Texas Indus., supra.
The plaintiffs do not, however, claim that the Spill Act's treble damages provision, as such, is invalid.[3] Instead they point to the fact that this provision is only triggered when a DEP order is disputed and claim that this is unconstitutional because it serves to deter judicial challenge to state action.
In Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court invalidated state rate-making legislation because the legislation permitted railroads to obtain judicial *76 review of rates only as defendants in criminal prosecutions. The legislation violated due process because "the penalties for disobedience [were] by fines so enormous and imprisonment so severe as to intimidate [affected parties] from resorting to the courts to test the validity of the legislation." Id. at 147, 28 S.Ct. at 448, 52 L.Ed. at 724. With this type of legislation, "the result is the same as if the law in terms prohibited the [affected party] from seeking judicial construction of laws which deeply affect its rights." Id. If a challenging party has reasonable grounds for contesting the validity or applicability of an administrative order, it must be able to do so without penalty. See Ex parte Young, supra; Oklahoma Operating Co. v. Love, 252 U.S. 331, 338, 40 S.Ct. 338, 340, 64 L.Ed. 596, 599 (1920) (issuing permanent injunction restraining enforcement of penalties accruing during litigation "provided that the plaintiffs had reasonable ground to contest them"); Reisman v. Caplin, 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964).
The federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601 to 9657, has a provision similar to, but not identical with, the Spill Act's treble damages provision. 42 U.S.C. § 9607(c)(3) states:
If any person who is liable for a release or threat of release of a hazardous substance fails without sufficient cause to properly provide removal or remedial action upon order of the President pursuant to section 104 or 106 of this Act, such person may be liable to the United States for punitive damages in an amount at least equal to, and not more than three times, the amount of any costs incurred by the Fund as a result of such failure to take proper action.
The main difference between the language in the Spill Act and that of CERCLA is the former's mandatory tone. Compare N.J.S.A. 58:10-23.11f(a) ("Any discharger who fails to comply ... shall be liable ... in an amount equal to three times the cost of such removal.") (emphasis added) with 42 U.S.C. § 9607(c)(3) ("If any person ... fails without sufficient cause", etc.) (emphasis added).
CERCLA's treble damages provision has been challenged on the same ground as the Spill Act's treble damages provision is today challenged, as an allegedly unconstitutional infringement *77 of federal due process rights. The federal courts that have addressed this claim have ruled that CERCLA's provision is constitutional. They have done so in part by interpreting the phrase "without sufficient cause" to authorize a "good faith defense": a party will not be liable for treble damages if it has a reasonable good faith belief that it has a valid defense to the remedial order. Solid State Circuits, Inc. v. United States, 812 F.2d 383 (8th Cir.1987); Wagner Seed Co. v. Daggett, 800 F.2d 310 (2nd Cir.1986); Aminoil, Inc. v. United States, 646 F. Supp. 294 (C.D.Calif. 1986); Wagner Elec. Corp. v. Thomas, 612 F. Supp. 736 (D.Kan. 1985); United States v. Reilly Tar & Chem. Corp., 606 F. Supp. 412 (D.Minn. 1985). Under a good-faith exception, treble damages cannot be imposed on a non-complying party "if the party opposing such damages had an objective reasonable basis for believing that the EPA's order was either invalid or inapplicable to it." Solid State Circuits, supra, 812 F.2d at 391 (footnote omitted).
The State purports to sidestep these constitutional claims by arguing that the directives that apparently impose potential liability for treble damages are actually merely notice of obligations under the Spill Act. It characterizes the treble damages provision as a mandatory, not a conditional, multiple damages provision. It argues that the directives do not possess independent legal force, i.e., they do not as such prescribe liability for treble damages, but serve only to provide notice to potentially responsible parties of their obligations under the Spill Act. The directive, according to the State, simply gives the polluter the opportunity to clean up any dump sites for which it is responsible, thus serving only as a notice and as a basis for a defense to the imposition of treble damages liability: if the notice is not sent, liability cannot be imposed. The State contends that since the Legislature has the power to impose unconditional mandatory treble liability, it surely has the power to impose contingent treble damages, which benefits the alleged discharger  the ability to avoid "mandatory" multiple damages *78 for the cleanup through compliance with the terms of the directive.
The State's characterization of the treble damages provision avoids reality. N.J.S.A. 58:10-23.11f(a) states that the only choice a company has when faced with a DEP directive is compliance or treble damages. Unlike most other laws with multiple damage provisions, the Spill Act's treble damages provision does not merely notify persons of potential liability and inform those persons how they may stay clear of illegal behavior. These provisions are indisputably coercive; they have the purpose and the effect of compelling persons to pay money to the State, even if those persons have a valid claim that they are not justly or legally responsible for the payment.
No exception is made for those who refuse compliance in order first to determine the directive's validity. However, the DEP argued that even though a charged party cannot avoid compliance with the required payment of costs, there are means available for bringing a challenge to the validity of a DEP directive without risking further penalties. The alleged violator can pay the costs assessed in the directive and then seek reimbursement from the Spill Fund. Such hearings would be before boards of arbitration with appeals to the Appellate Division.
Boards of arbitration shall be convened by the administrator when persons alleged to have caused the discharge, the administrator or other persons contest the validity or amount of damage claims or cleanup and removal costs presented to the fund for payment. If the source of discharge is not known, any person may contest such claims presented for payment to the fund.
* * * * * * * *
One board of arbitration may be convened to hear and determine all claims arising from or related to a common discharge.
The boards shall have the power to order testimony under oath and may subpoena attendance and testimony of witnesses and the production of such documentary materials pertinent to the issues presented to the board for determination. Each person appearing before the board shall have the right to counsel.
* * * * * * * *

*79 Determinations made by the board shall be final. Any action for judicial review shall be filed in the Appellate Division of the Superior Court within 30 days of the filing of the decision by the administrator. [N.J.S.A. 58:10-23.11n(a), (c), (d), (g).]
The Supreme Court has held that it is sufficient for the due process guarantee of the federal constitution that there be some forum where an order's validity can be challenged without penalty; it need not be the same forum where enforcement actions are prosecuted and the challenge need not be pre-payment. Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944). Under this analysis, the pre-adjudication payment of actual costs under the statute with the opportunity later to contest the legality or reasonableness of such costs without further penalty[4] could be viewed as satisfying essential due process concerns.
Nevertheless, under the circumstances, there remain doubts as to the Act's validity under the federal constitution because of the way in which it combines the lack of a pre-enforcement hearing with strict liability and added penalty for noncompliance.
The United States Supreme Court has never before ruled on the constitutionality of a statutory enforcement scheme that combined, as the Spill Act does, joint and several liability, nearly absolute liability, the virtual elimination of substantive defenses, mandatory treble damages, and no pre-enforcement hearing. In Woodland Private Study Group v. State of N.J., 616 F. Supp. 794 (D.N.J. 1985), the validity of such a scheme, in the context of the Spill Act, was examined by a federal district *80 court and found to satisfy due process requirements.[5] The court's analysis in that case, however, failed to fully focus on the significance of the fact that the Act's provision of a means to challenge administrative action is only free of the threat of added punitive damages if done after compliance with such action.
Due process standards arguably call for a right to challenge the validity of a legislative or administrative order without facing the possibility that one will incur a greater penalty if such challenge is unsuccessful than the loss resulting from such an order if left unchallenged. See United States v. Pacific Coast European Conference, 451 F.2d 712, 717 (9th Cir.1971) (under due process a "constitutional tolling principle" prevents one from being forced to pay a statutory penalty for noncompliance with an act during the time it is being tested in good faith); cf. Brown & Williamson Tobacco Corp. v. Engman, 527 F.2d 1115, 1119 (2nd Cir.1975) ("one has a due process right to contest the validity of a legislative or administrative order ... without necessarily having to face ruinous penalties if the suit is lost."). While none of the individual components of the Spill Act enforcement framework violates due process requirements the combined weight of the joint and several strict liability scheme with the lack of a pre-enforcement hearing opportunity and the imposition of punishment in the form of treble damages upon failure to comply  even if *81 such failure is predicated upon a reasonable defense  may be beyond constitutional tolerance.
The parties have questioned the Spill Act's validity under the New Jersey Constitution and the state doctrine of fundamental fairness.[6] The New Jersey Constitution offers protections that go beyond those offered by the United States Constitution. See State v. Novembrino, 105 N.J. 95 (1987); State v. Hunt, 91 N.J. 338 (1982); State v. Alston, 88 N.J. 211 (1981). We have resorted to the state constitution when there was uncertainty as to the protection afforded by the federal constitution. See, e.g., State v. Williams, 93 N.J. 39 (1983); State v. Schmid, 84 N.J. 535 (1980), appeal dismissed sub nom. Princeton Univ. v. Schmid, 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982). In a variety of contexts we have concluded that, compared with the federal constitution, the state constitution affords parallel protections, e.g., State v. Gilmore, 103 N.J. 508 (1986); State v. Saunders, 75 N.J. 200 (1977), or greater protections, e.g., State v. Novembrino, supra; State v. Alston, supra. In addition, the doctrine of fundamental fairness, which has roots in the New Jersey Constitution and in New Jersey common law, has been applied to grant persons procedural protections that may exceed those offered by the due process clause of the federal constitution. See, e.g., State v. Abbati, 99 N.J. 418 (1985); State v. Gaffey, 92 N.J. 374 (1983); State v. Tropea, 78 N.J. 309 (1978); State v. Talbot, 71 N.J. 160 (1976); State v. Gregory, 66 N.J. 510 (1975); State v. Kunz, 55 N.J. 128 (1969). See generally State v. Ramseur, 106 N.J. 123, 376-79 (1987) (Handler, J., dissenting) (discussing fundamental fairness protections against arbitrary governmental actions). We have recognized the relevance of independent state constitutional protections *82 and the doctrine of fundamental fairness for the protection of civil rights and interests. See State v. 1979 Pontiac Trans Am, Color Grey, 98 N.J. 474 (1985); Right to Choose v. Byrne, 91 N.J. 287 (1982); Burlington County NAACP v. Mt. Laurel, 67 N.J. 151 (1975); cf. Cunningham v. Department of Civil Serv., 69 N.J. 13 (1975) (as a matter of fundamental fairness and administrative due process demoted civil service employees held entitled to an evidentiary hearing to resolve a contested factual issue); King v. South Jersey Nat'l Bank, 66 N.J. 161, 191-98 (1974) (Pashman, J., dissenting) (state constitution's guarantee of due process should be held to void a contract's acceleration clause).
The Spill Act, as the State would have it interpreted and applied, could have a draconian impact on affected parties. A small company with arguably little or no actual responsibility for the discharge of a hazardous substance might be forced to pay a large amount of money, with no effective pre-payment judicial recourse, no means to challenge the DEP's estimate of the monetary amount needed, and a potentially long delay before it gets its refund from the Spill Fund or the contribution due from the other liable dischargers. The result in fact could be confiscatory. This kind of problem  undue harshness in the individual application of the Act's enforcement provisions  can be rectified by recognition of the availability of a good-cause exception. The availability of such an exception would allow a genuinely aggrieved party with legitimate defenses to urge these in order to avoid the imposition of heavy penalties. Provisions for such an exception could be achieved through the minimal modification of the literal terms of the Act by implying an exception similar to that found in CERCLA. See supra at 76. Without an implied good cause, or reasonable cause exception, the statute may infringe the state or federal constitutions.
The question thus presented is whether the implication of such a good cause exception can be reconciled with the intent *83 of the Legislature. Given the choice between invalidating the Spill Act and reading a provision into the Act, we choose the latter course. "In appropriate cases, a court has the power to engage in `judicial surgery' or the narrow construction of a statute to free it from constitutional doubt or defect." N.J. Chamber of Commerce v. N.J. Elec. Law Enforcement Comm'n, 82 N.J. 57, 75 (1980); see Town Tobacconist v. Kimmelman, 94 N.J. 85, 104 (1983). This action is appropriate when the Legislature would have preferred the statute to remain in effect in modified form to the statute being invalidated. Id. We therefore hold that treble damages need not be assessed if the party opposing such damages had an objectively reasonable basis for believing that DEP's directive was either invalid or inapplicable to it, and that any decision by the DEP to seek treble damages in a recovery action be subject to judicial review as any other agency action. We find that such limitation comports with what we perceive to be the intent of the Legislature. When viewed in the context of the broadened implied powers granted the DEP under our analysis, the scheme effectuates the legislative intent of providing a powerful anti-pollution mechanism, serving to discourage potentially liable parties without needlessly acting against potentially innocent parties with undue harshness. The imputation of a narrowly drawn good-cause defense is a reasonable constraint on the broad implied agency powers we find by our expansion of the literal terms of the Spill Act.
We are satisfied that so interpreted, the Act will not be significantly weakened and that responsible polluters will remain fully amenable to the necessarily strict enforcement machinery of the Act. The Spill Act serves the important interests of preventing and eliminating contamination from toxic waste dumps.[7] The authorization of a good-cause defense to the Act's *84 treble damages provisions will validate the Act's enforcement mechanisms. The Act so construed does not mean that compliance with DEP directives will be slowed because some parties challenge the directives in court. This would misstate the procedural posture in which a good-cause defense comes into play. A good-cause defense is relevant only once a company refuses to comply with a DEP directive and DEP moves in court to enforce the directive. In accordance with its directive the DEP in its enforcement action may seek treble damages as a penalty for non-compliance.[8] If the court determines that a company's basis for non-compliance is objectively reasonable, even if the court does not ultimately uphold the company's argument, DEP's request for treble damages may be rejected if not reasonable in light of all the circumstances. The enforcement provisions of the Act will remain effective tools to secure swift compliance with the terms of the Act to the end that hazardous discharges are cleaned up as promptly as possible by those polluters responsible. Given the importance of the objectives the Spill Act serves, the Legislature would prefer somewhat less efficient, but still effective, enforcement provisions to none at all.
We turn more specifically to the additional issues of what kind of good-cause defenses would be available in a treble damages/enforcement action. This calls for an examination of the substantive liability of parties for removal under the Act and the nature and extent of damages available.
*85 A party even remotely responsible for causing contamination will be deemed a responsible party under the Act. See Ventron Corp., supra. As dischargers, Kimber Petroleum and Solar Oil are each responsible parties regarding the contamination that made the local water supply unusable. N.J.S.A. 58:10-23.11g(c) states that responsible parties are liable for "all cleanup and removal costs." Thus each is liable under the Spill Act for the total costs entailed in the cleanup and removal of the contaminants.
Since the Act provides for joint and several liability DEP's assessment of one's proportional share of liability will rarely be the subject of a good-cause defense. In addition, the Act's strict liability provision will severely restrict claims involving the initial triggering of liability. Nevertheless, there remains a number of possible good-cause defenses. Kimber Petroleum and Solar Oil, for example, raise several arguments against the validity of the statutory damages scheme. One claim is that the costs sought are unreasonable; it is asserted that the work to construct a new water supply is beyond the statutory liability of a responsible party, which is limited to, at most, the cleanup and removal of the hazardous waste discharge. The meaning of the statute on this point is not clear. N.J.S.A. 58:10-23.11g(a)(2) defines "all cleanup and removal costs" to include "the cost of restoration and replacement, where possible, of any natural resource damaged or destroyed by a discharge." Funding the creation of an alternative water supply might also fit under the equally broad definition, id. at (a)(1), that cleanup and removal costs include damage to private property. Thus it is arguable that a discharger would be responsible for creating an alternative long-term water supply. On the other hand, the construction of the extensive infrastructure entailed in a water supply may not be within the contemplation of replacing a natural resource destroyed by a discharge. Moreover, genuine disputes may arise in terms of whether the previous water supply was wholly a part of a "natural resource" and whether a discharge brought about the *86 destruction of the natural resource, as well as in terms of the costs reasonably related to any replacement of the natural resource.
While the statute then can be read broadly to encompass such far ranging costs as being included in "removal costs", we acknowledge a countervailing position that such costs exceed those reasonably within the contemplation of the statute. We cannot on the record presented and the issues actually argued resolve these questions of statutory construction. We raise them to suggest that in an appropriate case, an aggrieved party should have the right, in an action for reimbursement to recover costs, to demonstrate that an element of the costs imposed by DEP is unreasonable. An identical contention raised on an objectively reasonable basis could constitute a "good-cause defense" to a pre-payment enforcement directive.

IV.
We conclude that (1) a good-cause defense by necessary implication is provided under the treble damages provision of the Spill Act, (2) good-cause defenses include challenges to the reasonableness of the costs assessed, and (3) the DEP has the authority to seek removal costs from dischargers while controlling remedial action and obtain treble damages upon failure to pay such costs.
Accordingly, we rule that the DEP directive issued to Kimber Petroleum and Solar Oil threatening treble damages upon non-compliance complies with the Spill Act. The provisions of the DEP directive ordering the payment of removal costs are valid and enforceable subject, however, to any good-cause defense that may be raised by the appellants. Nevertheless, in this case we need not consider further the applicability of a good-cause defense as a basis for denying treble damages because the Court has ordered the parties to pay the remedial costs assessed by the directive or security for those costs and has for purposes of this appeal excused liability for treble damages *87 based upon the earlier failure of the parties to have complied with the DEP directive. The directive of DEP, as modified by the order of this Court on appeal, is affirmed.
WILENTZ, C.J., dissenting.
The Court's decision today very substantially expands the power of the State, through the Department of Environmental Protection (DEP), to remedy the adverse effects of discharges of hazardous substances. In attempting to address the grave risks that hazardous substances pose to our society, the statute provides that the DEP may require a polluter to clean up and remove a hazardous discharge and its effects. Today the Court correctly finds that the DEP may alternatively require the polluter to pay on demand the estimated cost of such cleanup, leaving it to the Department to complete the task. Whereas the former is provided expressly in the statute, the latter power is found to exist by implication. This is a most important, indeed, a necessary, expansion of the Department's vital role in this area.
It is therefore ironic that in this same decision the Court provides polluters with a defense found nowhere in the Act. This defense allows a polluter to escape treble damages for refusal to comply with a DEP demand for cleanup and removal money whenever the polluter's refusal to pay was based on "good cause." The Court thereby holds that despite the Act's explicit and unqualified requirement for cleanup on demand (or, alternatively, for payment on demand), the polluter who refuses to pay may successfully avoid liability for treble damages  the weapon designed by the Legislature to assure that cleanup funds would immediately be made available by polluters. If the polluter is found to have had "good cause" to refuse such payment, no treble damages are imposed even though the polluter was, in fact and in law, liable for such payment.
I dissent from that holding. Not only does the statute not provide for a "good cause" exception  on this there is no *88 dispute  but furthermore the fair intent of the law is completely inconsistent with any such exception. The Constitution does not compel today's decision, which, contrary to the majority's assertions, will seriously erode the effectiveness of this law.

I.
The magnitude of our state's hazardous waste problem is beyond dispute. New Jersey produces 12.5% of the United States' chemical output, making the state the second largest chemical producer in the nation; 970 chemical plants are located in this state. Chemical Industry Council of New Jersey, Press Release (Trenton, N.J., n.d.). Moreover, chemicals produced out of state are transported along the northeast corridor via New Jersey's highways and railways, where accidents can lead to their release into this state's environment. The risks are aggravated by geologic, hydrologic, and soil conditions that make New Jersey's water supply peculiarly vulnerable to contamination. Of the fifty states, New Jersey is thought to have the most severe hazardous waste problem. Morris, "Hazardous Wastes in New Jersey," 38 Rutgers L. Rev. 623, 624-26 (1986); see also New Jersey Department of Environmental Protection, Status Report on the Hazardous Waste Management Program in New Jersey, Vol. II at 19 (Oct. 1986) (New Jersey leads the nation in the number of hazardous waste sites identified by the Federal Superfund program with 97 of the 888 designated as of 1986); English, "Hazardous Waste Regulation: A Prescription for Clean Water," 13 Seton Hall L. Rev. 229, 230-31 n. 11 (1983) (by producing approximately 350,000 tons of hazardous waste per year, New Jersey surpasses all other states in the generation of hazardous waste).
The Legislature's decision to use unconventional remedies in the Spill Compensation and Control Act ("the Act" or the "Spill Act"), N.J.S.A. 58:10-23.11 to -23.11z, was based on a valid perception that this state faces an enormous environmental problem and that a great deal of money will be required to *89 address it. The Legislature sought to require "the prompt containment and removal of ... pollution and substances." N.J.S.A. 58:10-23.11a. To help defray the costs, the Legislature created a fund by taxing those in the petrochemical industry. The Fund is available to pay damages promptly to victims of pollution and to finance cleanup and removal efforts. The Act states that
[w]henever the department acts to remove a discharge or contracts to secure prospective removal services, it is authorized to draw upon the money available in the fund. Such money shall be used to pay promptly for all cleanup costs incurred by the department in removing or in minimizing damage caused by such discharge. [N.J.S.A. 58:10-23.11f(a).]
Thereafter, the Fund seeks reimbursement from those responsible for the pollution.
A critical attribute of the law, then, is that it creates an immediately available source of funds to clean up discharges of hazardous materials. The conventional approach  a suit by the DEP to establish liability, a judgment requiring the defendant to clean up or to pay for the cleanup, and ultimately further orders to compel compliance (including orders holding defendant in contempt, setting a date for compliance, extending the date, and so on)  was deemed inadequate for the solution of the problem. The Legislature mandated the expeditious cleanup and removal of hazardous wastes because this problem is not static, but constantly growing. The need was for relief from pollution, not for judgments and orders that, although perhaps vindicating individual rights, would leave pollution removal to the remote and uncertain future. The Legislature concluded that there was a need for immediate relief. The Fund is one means devised by the Legislature to achieve this result. Its purpose is to make sure that cleanup and removal come first  through the Fund  with litigation, if any, to follow.
Despite its size, the Fund does not begin to meet New Jersey's cleanup needs. The problem of remedying both today's new spills and the consequences of past pollution far *90 exceeds the limits of the Spill Fund.[1] It is obvious that more resources are needed.
The Legislature decided that whatever else was needed would come not from the taxpayers but from the polluters themselves.[2] It allowed the DEP to obtain the money for cleanup and removal of hazardous substances by demanding payment from alleged polluters prior to any hearing. To discourage refusal to comply with a DEP demand for payment, the Act imposes treble damages on the party refusing initial payment if that party is ultimately found to have been liable. N.J.S.A. 58:10-23.11f(a). It is that part of the solution to this problem that today's decision weakens, perhaps severely.
The methods devised by the Legislature of assuring relatively rapid cleanup of these sites include imposition of almost absolute liability for cleanup and removal costs. "An act or omission caused solely by war, sabotage, or God, or a combination thereof, shall be the only defenses which may be raised by any owner or operator of a major facility or vessel responsible for a discharge in any action arising under the provisions of this Act." N.J.S.A. 58:10-23.11g(d). Moreover, liability is "joint and several." Anyone "in any way responsible" for the discharge that ultimately poisons a site is liable for all cleanup and removal costs. N.J.S.A. 58:10-23.11g(c). In other words, a *91 party, free of any negligence, who discharges hazardous materials on a particular site, is fully liable for all damages caused by the contamination of that site and all cleanup costs even though the discharges of other parties may have been greater and may have involved negligence. The party deemed liable is left to seek contribution from other parties responsible for the contamination of the site.[3]
The majority expresses no objection to the Legislature's imposition of absolute liability and joint and several liability. It is the next step in the Legislature's attempt to remedy the problem that causes the Court to hesitate in executing this law as written by the Legislature. The legislation provides that one designated by the DEP as liable for these costs may be required on demand of the DEP  before any adjudication of such liability  to undertake the entire cleanup and removal task. Alternatively, as the Court today correctly holds, the party may be required to pay to the DEP, on its demand, an amount sufficient to enable the DEP (or its contractors) to effect the *92 cleanup and removal itself. If, on demand for that sum, the designated party fails to pay, it is, should it ultimately be held liable, liable not only for the entire cost, but for three times that cost. N.J.S.A. 58:10-23.11f(a). The treble damages provision of the Act thus "provides strong incentives to private parties to participate in the hazardous waste cleanup process and to determine the extent of their liability after such participation has commenced." Woodland Private Study Group v. New Jersey, Dep't of Envtl. Protection, 616 F. Supp. 794, 811 (D.N.J. 1985). The statute allows for the possibility that a party wrongly but honestly believing that it is not liable (or not liable for the amount demanded) will suffer punitive treble damages if it withholds payment based on that belief. It is this possibility that prompts the Court to modify the remedy.
The Court holds that treble damages are not recoverable if the responsible party's refusal to pay is based on "good cause" even when that party is, in fact, fully liable. "Good cause" is not fully described, but it appears to be an honest belief, grounded on objective fact, that the party is not liable or, if liable, is not liable for the amount claimed. As the majority says, "[i]f the court determines that a company's basis for noncompliance is objectively reasonable, even if the court does not ultimately uphold the company's argument, DEP's request for treble damages may be rejected if not reasonable in light of all the circumstances." Ante at 84. Precisely what this means is not clear. It may imply, in addition to a defense based on the objective reasonableness of a refusal to comply with the DEP's demand for funds, a further defense, in the action to recover treble damages, that the DEP's request is "not reasonable in light of all the circumstances."
Before dealing with the legal analysis of the Court's limitation on this treble damage power, a summary of its practical effect is instructive. As written by the Legislature, this seemingly harsh provision might have promptly supplied the State with the wherewithal to meet its cleanup and removal goals. Those companies partly or fully responsible for creating hazardous *93 waste sites would presumably have readily paid the amount demanded in order to avoid the risk of treble damages. Many of them are fully able to make such payments with only minimal impact on their operations. The State would be able to start and finish the cleanup. And the alleged polluter, if indeed it was not liable or was overcharged for the cost of the cleanup, would be entitled to reimbursement from the State through the Fund. The goal, immediate cleanup and removal, would have a chance of being achieved.
It is the importance of this goal that seems not to have had a sufficient impact on the Court's analysis. The threat of damage from these sites is severe and imminent. Failure to address the threat will be deleterious not only to industry and growth but to life itself. The goal of the challenged provision is to force polluters to pay prior to litigation so that the State can address the problem immediately.
Balanced against this goal, the Court posits the potential unfairness of the remedy. An uninsured small business, truly in doubt as to its liability, may be faced with a grim choice. It may pay, thereby placing the company in financial jeopardy notwithstanding the prospect of reimbursement, or, alternatively, it may refuse to pay and risk an ultimate treble damage sanction. If unfairness does result, the administrator of the Fund has discretion to compromise a claim against a discharger that would otherwise be subject to the treble damage penalty because of its refusal to pay. It is noteworthy that in the companion case, In re J.I.S. Industrial Service Company Landfill, 110 N.J. 101 (1987), the DEP, after making a demand for payment (in that case to finance a design and feasibility study), thereby triggering potential treble damages, settled the matter apparently by agreeing to various contributions from numerous dischargers. In other words, the law does not require the enforcement agency to act unfairly. See N.J.S.A. 58:10-23.11q.
The Court underestimates the potential impact of its "good cause" exception to the treble damages remedy. Each discharger *94 will seek to slip through the loophole created in this case. Whether it be the small business or the multinational corporation, management, in deciding whether to refuse to pay, will ask itself whether the circumstances might persuade a judge  or a jury  that the company's refusal was reasonable, or that treble damages were not "reasonable in light of all of the circumstances." See ante at 84.
The concept of "good cause" has performed a great service in the law, especially where narrow specifics in legislation or decisional law are not feasible. The virtue of "good cause"  its flexibility, its expansiveness, its ability to cover many different kinds of situations, difficult to define in advance  is in this situation a vice. Instead of the assured prompt flow of funds to the State from those who are responsible for polluting our environment, instead of the prompt cleanup and removal of hazardous substances, we will have delay and litigation leading to the compromises that have for so long afflicted governmental attempts to act effectively in this area.
This is an arena where desperately needed action has been dreadfully delayed. In re J.I.S. Industrial Service Company Landfill, supra, 110 N.J. 101, is but one example. After twenty years, the courts, the DEP, and the polluter are still arguing about a plan for cleanup. With today's judicially designed exception to liability, we can expect more of the same  delay reinforced by the predictable reluctance of judges and juries to impose treble damages on a polluter who shows some semblance of honesty and "good cause" in not putting up the money.
No balancing of societal interests  assuming this were a permissible concern of the Court  calls for such a result. By that balance the Court, in order to avoid the possibility of unfair application to a few, may be seriously impeding society's attempt to escape the certain substantial destruction caused by these poisonous sites. Our need for the swift action that the threat of treble damages would elicit dwarfs the unfairness that may result from the actual imposition of this remedy.
*95 The Court has created the "good cause" exception not because the Act without it would be unconstitutional, but rather because the Act "may" be unconstitutional. Ante at 82. Noting that "none of the individual components of the Spill Act enforcement framework violates [federal] due process requirements," the Court concludes that the "combined weight" of its various elements "may be beyond constitutional tolerance." Ante at 80-81 (emphasis supplied). The Court moreover suggests that the Act may be invalid under the New Jersey Constitution and our State's "doctrine of fundamental fairness." Ibid. Never having decided that the statute does infringe state or federal constitutional rights, or our state's concept of fundamental fairness, the Court nevertheless concludes that it is forced to "the choice between invalidating the Spill Act and reading a provision into the Act," i.e., the "good cause" exception. Ante at 84. The Court has seriously weakened the statute in order to avoid a constitutional deficiency that it has never found and one that, in my opinion, does not exist.
It is difficult to meet the Court's constitutional argument, since the majority concedes that "it is sufficient for the due process guarantee of the federal Constitution that there be some forum where an order's validity can be challenged without penalty; it need not be the same forum where enforcement actions are prosecuted and the challenge need not be pre-payment." Ante at 79. Perhaps the strongest argument that the Court can muster to support its doubt about the constitutional validity of these provisions is its statement that "the United States Supreme Court has never before ruled on the constitutionality of a statutory enforcement scheme that combined, as the Spill Act does, joint and several liability, nearly absolute liability, the virtual elimination of substantive defenses, mandatory treble damages, and no pre-enforcement hearing." Ante at 79. Each of those, however, as the Court has pointed out, ante at 80-81, is constitutional; there is no *96 claim that any one of them violates due process, nor any case that holds that the "combined weight" does so. As a matter of fact the only case passing on the issue, a federal district court case, Woodland Private Study Group v. State of New Jersey, supra, 616 F. Supp. 794, sustains the constitutionality of the Act.
Other than noting instances where this Court has held that the protections of the state Constitution exceed those of the federal Constitution, today's decision makes no attempt to articulate what state constitutional principles are violated. The position of this Court in the past has been that
[w]here only property rights are involved, mere postponement of the judicial inquiry is not a denial of due process, if the opportunity given for the ultimate judicial determination of the issue be adequate; delay in the judicial determination of property rights is ofttimes unavoidable where it is essential that governmental needs be immediately satisfied. [Jamouneau v. Harner, 16 N.J. 500, 522-23 (1954), cert. den., 349 U.S. 904, 75 S.Ct. 580, 99 L.Ed. 1241 (1955).]
The Court today has failed to demonstrate that this principle should be abandoned.
The "fundamental fairness" doctrine, cited by the Court to lend support to its conclusion, is inapplicable. That doctrine has been used by this Court, usually in the criminal context, to assure fairness to individual litigants where the procedure, though it may fall short of constitutional infirmity, shocks our sense of justice.[4] There is nothing that violates "fundamental fairness" in this design to protect society from the insidious *97 dangers of toxic substances. There is nothing fundamentally unfair in attempting to find an effective way to deal with one of the most threatening problems facing society today. There is nothing fundamentally unfair in deciding that, despite the potential for unfairness in individual cases, society's need for protection from the threat of hazardous waste sites requires the strictest rules of liability.
The Court expresses concern regarding what it perceives as the uncertainty of the right of a party who pays on demand to be reimbursed if the party establishes thereafter that it was not liable for the full amount paid. See ante at 80 n. 5. The Court would better vindicate the legislative will by interpreting the statute to assure complete reimbursement under those circumstances, instead of assuming that the only route to constitutionality (or more accurately the only route to avoid doubtful constitutionality) is to weaken severely a mechanism that the Legislature relied on to insure prompt availability of private funds to aid in the immediate cleanup of hazardous waste sites.
It requires no great imagination to find such a right of reimbursement. The statute makes it clear that the Fund will have an action against parties responsible for paying cleanup and removal costs. N.J.S.A. 58:10-23.11f. Strongly implied is the correlative right to reimbursement from the Fund where one not liable for cleanup and removal pays the Department on demand for the cost of that work. The Legislature surely intended that such a party, on establishing its non-liability or its *98 payment of more than was required, would have the right of reimbursement from the Fund. It strains credulity to infer that the Legislature intended, through its treble damage threat, not only to obtain funds from a possible polluter but to prevent a party, on proof of its innocence, from recouping what it had been unjustly forced to pay the State.
The Court notes that "the DEP maintains that no recourse to the Fund or its arbitration procedures may be had by a partially responsible discharger," and concludes that "[t]hus the remedy is illusory in almost all cases." Ante at 79 n. 4. Obviously, no recourse to the Fund may be had by any "partially responsible discharger" if, under the law, that discharger is liable for the entire damage. It is difficult to understand how the statute is unconstitutional (or the remedy "illusory") in failing to provide reimbursement to a party that has paid all of the damages when that party is in fact liable for all of the damages. If the partially responsible discharger has been overcharged for the total cost of the cleanup, however, that discharger must have recourse against the Fund.
If this is the concern that leads the Court to question the constitutionality of the statute, its insubstantiality is apparent. It is eliminated by a construction of the statute that is not only reasonable but compelled.
Had the Legislature intended a "good cause" exception, or anything like it, it would have said so. It provided, in this very Act, that penalties for failure to pay the tax imposed by the Act might be remitted if such failure "was excusable under the circumstances," N.J.S.A. 58:10-23.11h(e); no similar excuse is provided for refusal to pay for cleanup costs, see N.J.S.A. 58:10-23.11g(d). Moreover, the Legislature was undoubtedly aware of the provision in the parallel federal statute triggering treble damages only where the polluter's failure to clean up was "without sufficient cause." 42 U.S.C. § 9607(c)(3). The fact that our Legislature saw fit to impose treble damages without the slightest mention or hint that any excuse would suffice to avoid this sanction (if the party refused demand for *99 payment and was indeed liable) is proof of the Legislature's intent.
The Court's analysis of the possible claims of Kimber and Solar in this case, ante at 85-86, indicates the myriad circumstances that this Court envisions as perhaps giving rise to "good cause" to refuse payment. The effect of this broad exception, then, will be to encourage a polluter to resist DEP demands for cleanup and removal funds. What will occur is a full-blown trial involving complex questions of liability and quantum of damages that will likely take years to resolve. And that will be followed by appeals. One can predict that with the treble damage inducement thus drained of its strength, the State will be forced to look elsewhere for the needed financing to fund cleanups as spills occur. Meanwhile, continued delay will render cleanup and removal of hazardous substances increasingly difficult and expensive. By creating an exception where none was intended by the Legislature nor required by the Constitution, the Court has, I fear, significantly diminished the State's ability to deal effectively with a critical problem.
The Court effectively holds that unless a good cause defense is allowed the statute in its operation violates due process. Ante at 82. The Court notes, however, that treble damages could be assessed against polluters in a law that contained no demand-refusal triggering mechanism. Ante at 75. As the Court points out, "[t]he Supreme Court regularly applies antitrust legislation, which, like the Spill Act, combines treble damages with joint and several liability. The Sherman Antitrust Act has been interpreted in a way that those subjected to onerous joint and several liability provisions have no right of contribution." Ibid. (citations omitted). A demand-refusal triggering mechanism can, from that vantage point, be viewed as less onerous than the impact of antitrust legislation: not only does our substantive law allow a right of contribution from other tortfeasors, but treble damages can be escaped by paying the underlying liability on demand. The *100 Court nonetheless invalidates the statute, or more accurately, finds an implied "good cause" exception without which the statute "may" be unconstitutional. As the Court puts it, "[d]ue process standards arguably call for a right to challenge the validity of a legislative or administrative order without facing the possibility that one will incur a greater penalty if such challenge is unsuccessful than the loss resulting from such an order if left unchallenged." Ante at 80 (emphasis supplied).
It is widely recognized that the requirements of due process cannot be determined in the abstract, without regard to the concrete interests at stake in a given circumstance. See Jamouneau v. Harner, supra, 16 N.J. at 514 ("The basic right of private property perforce yields to an overriding public need."). In none of the due process cases cited by the Court was the state's interest as urgent and as weighty as it is here. Our state has found that in order to remove as quickly as possible the poisons that menace the public health and welfare, vast sums must immediately be made available to commence the effort. The only way such sums will be available is if polluters are forced to pay their fair share and to do so now. The Legislature has determined, and correctly so, that ordinary legal process is wholly inadequate for this purpose. Lawsuits to compel removal and cleanup, to recover damages on proof of liability, and to recover treble damages would all afford traditional due process, but would leave the state Fund without the means to satisfy its immediate need for funds from polluters.
The Legislature has concluded that the only remedy that will suffice is one that threatens severe sanctions against polluters who fail to pay immediately on demand. The process that is due to targeted companies, the Legislature has concluded, is the right, after such payment, to sue to recover all or some of the payment if it is ultimately determined that the company involved either was not liable at all, or was liable for less than it paid. If the process that is due to such polluters requires more, requires that they be allowed not to pay in advance, but to contest their liability before payment, or to escape the treble *101 damage sanction because of a reasonable belief as to their non-liability, the Legislature's goal will not be achieved, the money will not be forthcoming, the poison will not be removed. I do not believe that society is powerless to arrange for an immediate cleanup of these sites by forcing those who have caused the damage to pay for that cleanup up front. I do not believe that the only method by which the legislative goal of immediate cleanup can be achieved is through general taxation. That, unfortunately, is the result of today's decision.
I suggest that the Court goes wide of the mark in its conclusion that today's holding will cause little damage to the Legislature's effort to clean up hazardous waste sites immediately. Today's decision does not reckon with the unprecedented nature of the risk facing this state and its citizens. There is no room for judicial interference with this attempt at self-preservation. Only the clearest constitutional infirmity could justify today's result. I find none, and the Court finds, at most, that "maybe" such a defect exists. I would allow this statute to be enforced as written.
For affirmance as modified  Justices CLIFFORD, HANDLER, O'HERN, GARIBALDI and STEIN  5.
Dissenting  Chief Justice WILENTZ  1.
NOTES
[1] Under the federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601 to 9657, the Environmental Protection Agency (EPA) has three options: 1) it may file a civil suit to force a responsible party to remove the hazardous waste, id. at § 9606(a); 2) it may issue an administrative order requiring removal; id., and 3) it can use Superfund moneys for the cleanup, and the responsible parties would then be liable for those amounts to the Superfund. Id. at §§ 9604(a)(1), 9612(c)(1); see Wagner Elec. Corp. v. Thomas, 612 F. Supp. 736, 738 (D.C.Kan. 1985). The EPA thus does not seem to be authorized by CERCLA to act in a way analogous to the way that DEP has acted in this case: i.e., to maintain control of the cleanup operations while requiring the responsible parties to prepay.
[2] However, we note that if the DEP completed the cleanup and removal and then assessed costs, the accuracy of DEP's assessment of the costs would not be the issue it predictably is when a directive is issued to an alleged polluter before the cleanup has begun.
[3] A number of other New Jersey statutes authorize the recovery of treble damages. See, e.g., N.J.S.A. 2A:18-61.6 (fraudulent eviction), 2A:33-2 (impounding distressed chattels), 17:33A-7 (insurance fraud), 46:10A-2 (mortgage financing), 56:4-2 (unfair competition).
[4] Kimber Petroleum and Solar Oil argue that arbitration is an inadequate alternative forum for challenging the validity of DEP's Directives because only the amount of costs can be challenged in that forum. We do not agree with the implied narrow reading of N.J.S.A. 58:10-23.11n. The scope of the arbitrator's powers under that section is clearly broad enough to cover and challenge brought to the validity of any aspect of a directive. However, the DEP maintains that no recourse to the fund or its arbitration procedures may be had by a partially responsible discharger. Thus the remedy is illusory in almost all cases.
[5] The Woodland court based its determination on its conclusion that the Act's post-enforcement arbitration provision satisfied the needs of parties claiming innocence of any wrongdoing. Some question arises, however, as to the adequacy of this provision for parties admitting responsibility but contesting the amount of money determined by the DEP as being required. One reading of the Act would find arbitration unavailable, at least to the extent of any contested amounts, in such a situation. See Tree Realty, Inc. v. Department of Treasury, 205 N.J. Super. 346, 349 (App.Div. 1985) (any party in any way responsible for an offending discharge is fully liable and "there is no point in submitting the matter to arbitration."). Such a problem would not arise, however, if a good-cause defense was read into the Act.
[6] Cf. Pennzoil v. Texaco, ___ U.S. ___, ___-___ & nn. 10-11, 107 S.Ct. 1519, 1526-27 & nn. 10-11, 95 L.Ed.2d 1, 16-17 & nn. 10-11 (1987) (federal court should abstain from determining validity of state statute under the federal constitution in part to give the state courts an opportunity to modify the statute's interpretation in light of a state constitutional provision).
[7] The need for action in this area, and, in particular, for state government action, was shown by a recent report that stated that nationally there are tens of thousands of abandoned toxic waste dumps, of which around 20,000 are seriously contaminated. By contrast, in the seven years that the federal statute CERCLA has been in place to protect the public from such contamination, only 13 sites have been completely cleaned up. New York Times, April 19, 1987, at E4, col. 1.
[8] In addition, the DEP has the option of itemizing the amounts required by its directives in order to limit the extent of what can be reached by a good-cause defense.
[1] The Act itself recognizes the Spill Fund's inadequacy. "If and to the extent that he determines that funds are available, the administrator shall approve and make payments for any cleanup and removal costs incurred by the Department for the removal of a hazardous substance...." N.J.S.A. 58:10-23.11f(c) (emphasis supplied). Shortages are also anticipated where the Fund is used to pay damages. "In the event that the total awards for a specific occurrence exceed the current balance of the Fund, the immediate award shall be paid on a prorated basis...." N.J.S.A. 58:10-23.11r.
[2] Contributions from responsible parties figure prominently in this state's overall toxic cleanup scheme. According to a recent DEP report, "New Jersey expects approximately $500 million in contributions from private responsible parties to meet the total program goal of $1.6 billion." New Jersey Department of Environmental Protection, New Jersey Hazardous Waste Management Program Update 1 (March 1987).
[3] In New Jersey we have, until recently, accepted without question the idea that joint tortfeasors  those whose actions together add up to the total damage  are "jointly and severally" liable for the damages caused. The severity of the common-law rule was such that one could not obtain contribution even from those whose culpable actions were the major cause of the problem. That injustice has been remedied to a great extent, see N.J.S.A. 2A:15-5.3, but there has been no general change in the law that holds each one of the joint tortfeasors liable for the entire damage, whether or not it is able to obtain contribution. The Legislature has recently placed certain limitations on the liability of joint tortfeasors, but these explicitly do not apply in environmental cases. See L. 1987, c. 325, § 3 (to be codified at N.J.S.A. 2A:15-5.2) (joint tortfeasor in non-environmental case responsible for 20% or less of harm is liable only for attributable share of damages; party responsible for over 20% but less than 60%, though liable for full amount of economic damages, is liable only for attributable share of noneconomic damages); see also Licensed Alcoholic Beverage Server Fair Liability Act, L. 1987, c. 152, § 6 (to be codified at N.J.S.A. 2A:22A-6) (alcohol beverage server determined to be a joint tortfeasor is "responsible for no more than that percentage share of the damages which is equal to the percentage of negligence attributable to the server"); L. 1987, c. 404, § 5 (to be codified at N.J.S.A. 2A:15-5.5 et seq.) (similar limitation on liability of social hosts for alcohol-related accidents).
[4] Most of the "fundamental fairness" cases cited by the majority, ante at 81-82, involve criminal proceedings. See, e.g., State v. Abbati, 99 N.J. 418, 427 (1985) (fundamental fairness precepts confirm court's power to dismiss indictment with prejudice following mistrials attributable to repeated jury deadlocks); State v. Gaffey, 92 N.J. 374, 389 (1983) (due process and fundamental fairness considerations may, under certain circumstances, bar further prosecution of incompetent defendant whose previous indictment was dismissed without prejudice); State v. Tropea, 78 N.J. 309, 316 (1978) (whether or not double jeopardy clause applies to motor vehicle violations, considerations of fundamental fairness bar retrial); State v. Talbot, 71 N.J. 160, 168 (1976) (defense of entrapment is "bottomed on the principle of fundamental fairness"); State v. Gregory, 66 N.J. 510, 518 (1975) (fairness dictates compulsory joinder of prosecutions arising from same transaction); State v. Kunz, 55 N.J. 128, 144 (1969) ("rudimentary fairness" requires disclosure of presentence report and fair opportunity for defendant to respond prior to sentencing). The remaining cases cited similarly bear little resemblance to the instant matter. See, e.g., State v. 1979 Pontiac Trans Am, Color Grey, 98 N.J. 474, 485-86 (1985) (forfeiture statute construed to exempt innocent owners who use due care to prevent unlawful use of their property); Cunningham v. Department of Civil Serv., 69 N.J. 13, 26 (1975) (demoted civil service employees entitled to a hearing).