IN THE MATTER OF THE J.I.S. INDUSTRIAL SERVICE COMPANY LANDFILL; AND J.I.S. INDUSTRIAL SERVICE COMPANY; J.I.S. INDUSTRIAL SERVICE CORPORATION; AND DONALD W. JONES, INDIVIDUALLY.

Argued November 18, 1986—Decided April 18, 1988.

102

*James E. Stahl* argued the cause for appellants, J.I.S. Industrial Service Co., et al. (*Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl,* attorneys; *Anthony B. Vignuolo,* on the briefs).

*Ross A. Lewin,* Deputy Attorney General, argued the cause for respondent, State of New Jersey, Department of Environ-

mental Protection (*W. Cary Edwards*, Attorney General of New Jersey, attorney; *James J. Ciancia*, Assistant Attorney General, of counsel, *Ross A. Lewin* and *John A. Covino*, Deputy Attorney General, on the briefs).

*James W. Christie* submitted a brief on behalf of *amicus curiae*, Township of Gloucester (*Griffith, Burr, Angelini & Viniar*, attorneys).

*William H. Hyatt, Jr.* and *William J. Friedman* submitted a brief on behalf of *amici curiae*, Woodland Study Group, Minnesota Mining and Manufacturing Company and Rohm and Haas Company (*Pitney, Hardin, Kipp & Szuch*, attorneys).

The opinion of the Court was delivered by

HANDLER, J.

J.I.S. Industrial Service Company and J.I.S. Industrial Service Corporation (JIS) disposed of hazardous substances for nearly twenty-five years at a landfill in South Brunswick Township. The landfill was closed by court order in 1980. On May 19, 1986, the New Jersey Department of Envirnomental Protection (DEP) directed JIS to pay $700,000 to the DEP to fund a remedial investigation and feasibility study. This type of study is used to determine the nature and extent of groundwater contamination, and is the standard first step in a cleanup program. JIS was ordered to pay the amount within thirty days. DEP extended the deadline until July 21, 1986. In the meantime JIS had moved in the Appellate Division for a stay. That motion was denied on July 10, 1986.

JIS moved for a stay before Justice Daniel J. O'Hern, sitting as a single justice. In an order dated July 21, 1986, Justice O'Hern declined to grant a stay of the directive because of the possible danger the groundwater contamination posed to the public. Justice O'Hern did, however, stay any imposition of treble damages for noncompliance until the full Court had the opportunity to consider whether the Spill Act's treble damages provisions violated the appellants' due process rights by deny-

ing them any effective opportunity to seek judicial review of the directive. On October 20, 1986, the full Court modified the interim order, requiring appellants to pay within thirty days the costs imposed by the directive or to furnish satisfactory security for that amount, and enjoining the DEP from seeking treble damages pending disposition of the appeal. The full Court's order also directly certified the appeal then pending before the Appellate Division to consider the appeal with the companion case of *IMO Kimber*, 110 *N.J.* 69 (1988), which we also decide today.

We were advised that on February 20, 1987, the DEP amended its directive to JIS to reflect a revised cost estimate of $583,473. As a result of further investigation the DEP then identified twelve additional parties who it believed shared responsibility for the discharge of hazardous substances at the JIS landfill. This led to a supplemental directive, dated March 27, 1987, ordering these parties to pay the DEP the amount needed for the remedial investigation and feasibility study. Eleven of these parties then entered into an administrative consent order making provision for the required funding under terms mutually acceptable to them and the DEP.

As a result of the entry of the Consent Order the DEP no longer anticipates the need to use public funds in this case. It therefore no longer seeks treble damages from the parties who failed to comply with the initial directive in this matter. Thus, providing that the DEP actually receives these funds, the matter will become technically moot. Nevertheless, this mootness does not outweigh the need to review this matter. While we ordinarily refuse to examine moot matters due to our reluctance to render legal decisions in the abstract and our desire to conserve judicial resources, *see, e.g., Oxfeld v. New Jersey State Bd. of Educ.*, 68 *N.J.* 301, 303–04 (1975); *Sente v. Clifton*, 66 *N.J.* 204, 205 (1974), we will rule on such matters where they are of substantial importance and are capable of repetition yet evade review. *See, e.g., Matter of Conroy*, 98

*N.J.* 321, 342 (1985); *Guttenberg Sav. & Loan Ass'n v. Rivera,* 85 *N.J.* 617, 622–623 (1981); *Dunellen Bd. of Educ. v. Dunellen Educ. Ass'n,* 64 *N.J.* 17, 22 (1973). The matter at issue falls into this category. It is a matter of compelling public importance and is capable of repetition since costs for any additional investigative and/or cleanup measures at the landfill have expressly not been addressed by the Administrative Consent Order.

### I.

The dispute between these parties has a long history. For about twenty-five years—until the landfill was closed by court order in December 1980—JIS and Donald Jones, its former principal, directed and allowed the disposal of hazardous substances at the landfill. These hazardous substances included pesticides, petroleum hydrocarbons, various volatile organic substances and other chemical wastes and substances.

On August 26, 1975, DEP ordered JIS to install ground water monitoring wells, based on the fact that JIS had been disposing of chemical waste at the facility. DEP's analysis of samples taken from the wells resulted in a departmental order issued on December 19, 1975, which stated that improper disposal of petroleum products, hazardous substances and debris at the JIS site posed a real threat to groundwaters of the state.

JIS was, therefore, ordered to cease its landfill operations and to submit plans and specifications for the removal of materials previously disposed of "and/or the containment of any and all liquid leachate or runoff from said disposed material."

On January 16, 1976, DEP brought suit against JIS and Jones in the Chancery Division, Middlesex County. The suit sought injunctions prohibiting continued operation of the landfill and disposal of pesticides, contaminated containers, hazardous wastes, chemical wastes, bulk liquids or semi-liquids. DEP also sought an order for, among other items, the immediate

submission of plans and specifications for the removal of all previously-deposited waste or, alternatively, for the containment of all leachate or runoff and the immediate submission of plans and specifications for removal of contaminants from the ground water. Temporary restraints were issued limited to the disposal of only chemical wastes, industrial wastes and pesticides, or contaminated containers.

On June 17, 1976, DEP issued a notice of disapproval of JIS's engineering designs because the submitted design data lacked sufficient information on filling procedures, geological and hydrological conditions and a leachate collection and treatment system. The effect of the notice was to revoke JIS's registration to operate its solid waste facility. JIS did not request an administrative hearing on the notice of disapproval.

The suit pending in the Chancery Division went to trial in June 1977. After DEP had presented its case, the parties reached a settlement, set forth in a document dated June 13, 1977, entitled "Requirements for Continued Operation of the JIS Solid Waste Disposal Facility" (hereinafter referred to as the "Requirements Document"). The Requirements Documents was included in the order for judgment on June 27, 1977. It expressly stated not only that the JIS operation would have to meet all operational and engineering requirements found in DEP's regulations but, in addition, "[d]ue to the sensitive geological and hydrological conditions associated with the site, *there are some specific requirements that must be made for continued operation of this site."* (Emphasis added). *Inter alia,* the site-specific requirements set forth in the Requirements Document were:

1. JIS was to take a minimum of 36 borings on the landfill to establish areas of fill.

2. Disposal of solid waste in the future must be on lines areas. Detailed specifications are set forth for virgin [previously unfilled] and non-virgin [previously filled] areas.

3. Installation of proper leachate collection and treatment system.

4. Provision of a system for staging solid waste disposal.

5. Capping of the landfill with 18 inches clay and 6 inches of soil.

6. Construct on-site drainage ditches designed to promote rapid runoff.

7. Remedy the *existing groundwater pollution problem*. This requirement was divided into 2 phases.

*Phase 1*

a. Pump the groundwater so that it can be treated on-site or off-site.

b. Provide sufficient wells to collect and treat ground water contamination by JIS Landfill in such a manner that groundwaters leaving the site are not contaminated beyond background quality.

*Phase 2*—Minimize leachate production by:

a. Removal of previously deposited solid waste to lined area; or

b. Grade and cap the solid waste with 18 inches of clay, permeability 10 to the negative 7th power and 6 inches of top soil.

The two phases of the Requirements Documents represented exactly what JIS would have to do for the operation of the landfill and for the closure of the existing fill, respectively. The Requirements Document expressly stated that "[a]ny additional filling of solid waste is conditioned upon the effectuation of a remedy for the existing ground water pollution problem."

On September 28, 1977, DEP filed a motion for relief in aid of litigant's rights, seeking prohibition of all disposal operations at the JIS facility and requiring immediate implementation of a pollution abatement program as set forth in the Requirements Documents. The trial court granted the motion, directing that disposal operations cease effective October 24, 1977.

The closure order was later vacated and JIS was given until December 12, 1977, to submit the plans required by the June 27, 1977, order. DEP found the plan deficient both in terms of the proposed landfill design and the pollution problem. On January 4, 1978, DEP filed another motion seeking closure of the JIS facility until JIS submitted a closure plan complying with the Requirements Document.

The trial court then ordered an administrative hearing on DEP's disapproval of the engineering design submitted by JIS. This hearing was conducted in May 1978. On June 21, 1978, DEP adopted the hearing officer's report as its final decision, determining that JIS had failed to meet several of the requirements set forth in the Requirements Document. JIS appealed

the DEP determination, and, in an unpublished opinion, the Appellate Division dismissed the appeal and remanded the matter to the Chancery Division, for a determination whether DEP's decision concerning compliance with its order of June 27, 1977, was correct.

DEP filed a motion on May 28, 1980, again seeking closure of the JIS landfill until implementation of the pollution abatement remedy set forth in the Requirements Documents, as embodied in the order of June 27, 1977, and submission of plans in compliance with that order. The trial court granted the relief sought by DEP concerning immediate commencement of the pollution abatement program set forth in the June 27, 1977, order and ordered specific time deadlines to be met. In October 1980, the court permitted JIS until December 12, 1980, to submit plans consistent with the Requirements Documents of June 27, 1977. This deadline was not met and the landfill was ordered closed. JIS filed a notice of motion seeking relief form the closure, which was denied, the court observing that "to allow the reopening now for the purposes of solid waste landfill dumping would be an unwarranted concession, it would seem, in view of the dereliction, verging on contempt, of the Court's previous orders."

Although the landfill was closed, JIS remained obligated under the order of June 27, 1977, and the orders issued subsequent thereto, to prevent further groundwater contamination. On October 13, 1980, JIS submitted a proposed ground water treatment plan. A DEP ground water expert concluded that it was "in fact for more than a conceptual proposal and as such is far too general for an approval." He noted that "[m]uch more data is required and should be requested promptly."

On March 10, 1982, DEP filed a notice of motion to enforce the provisions of the June 27, 1977, order. On April 27, 1982, the court ordered JIS to submit an engineering plan for resolution of the ground water problem described in the Requirements Documents by May 8, 1982. JIS did not submit an

engineering plan. Rather, it submitted a proposal to conduct a 90–day ground water treatment study. In addition, it resubmitted, with a two-page revision, the engineering plan first submitted in December 1977, which had been rejected by DEP and the court.

While the plan was conceptually approved, DEP noted that "because the outline is very general, it is impossible for DEP to submit more specific evaluation." DEP noted that the proposal did not provide testing for off-site contamination, the presence of non-volatile chemicals, or the size of the plume of contamination. DEP also noted that the plan did not conform with the court's order of April 27, 1982, because it did not provide engineering designs for treatment of the contaminated ground water, as agreed upon in the order of June 27, 1977.

In August 1982, JIS moved to have the closure order vacated. The trial court denied the motion, stating:

> It was clear that by 1980 Judge Furman was sufficiently impatient with JIS's performance as to make ... an order penalizing the JIS sufficiently so that he hoped that it would generate immediate positive response. That hope has not been fully realized.

On December 10, 1982, DEP issued an administrative order concluding that Donald Jones, based on his long-standing record of noncompliance, "lacks necessary moral integrity to operate a solid waste facility." A hearing was requested before the Office of Administrative Law.

In January 1983, JIS applied for a New Jersey Pollution Discharge Elimination System permit, necessary for commencement of the ninety-day pilot study for treatment of the ground water contamination. On March 9, 1983, DEP approved the ninety-day study. The approval expressly stated that continued discharges after the ninety-day period would be submit to the filing and granting of appropriate permits.

In June 1983, DEP filed a notice of motion for the appointment of a receiver for the JIS solid waste operations and assets. DEP alleged that JIS had failed to take any action either to begin the proposed ninety-day ground water treatment study or

to cap the landfill. Before the motion was heard, JIS initiated the ninety-day ground water treatment study and began improvements at the landfill. The court denied the motion for receiver without prejudice to its later renewal if necessary.

Based upon chemical analyses of numerous water samples taken at and about the JIS site, there has been and continues to be substantial contamination of the ground water under the property. The Requirements Document, which was embodied in the court's order of June 27, 1977, confirms the existence of a ground water pollution problem.

The administrative hearing on DEP's administrative order of December 10, 1982, was conducted in October and November 1983. Addressing JIS' contention that the 1977 Requirements Document merely represented an outline rather than specific requirements, the administrative law judge stated:

I must note there that whatever the merits of these defenses in a vacuum, it is fairly clear that they ignore that JIS bound itself in the requirements document to meet many of the criteria to which it was objecting.

\*       \*       \*       \*       \*       \*       \*       \*

If JIS had any doubt about the wisdom of any of the criteria *or about its overall responsibility to install a groundwater decontamination system,* it ought not to have entered into the consent judgment. (Emphasis added).

The ALJ issued an Initial Decision finding that DEP was entitled to revoke the collector/hauler registration of JIS and to deny its transfer station application. He also held that the DEP could not revoke the registration for the landfill since the landfill was already closed. On the issue of Donald Jones' fitness to engage in solid waste activities, the ALJ ruled that, "purely as a matter of law," DEP was not entitled a finding of unfitness based upon the state of the law at that time. Former DEP Commissioner Hughey adopted the Initial Decision with the modification that DEP was, in fact, entitled to finding that Jones was unfit. JIS appealed.

On December 30, 1985, the Appellate Division issued a decision that affirmed DEP's orders closing the landfill and denying the transfer station permit. The decision modified the

general debarment set forth in the Final Decision and allowed Donald Jones to continue the JIS collector/hauler—as opposed to landfill—business. The Appellate Division expressly found "sufficient reasonably documented specific default by appellants JIS and Jones of orders of the DEP and the Chancery settlement agreement to substantiate the departmental orders closing the landfill and denying the transfer station permit."

It is against this background that DEP issued a directive on May 19, 1986. The directive letter ordered JIS to pay $700,000 to fund costs of a remedial investigation and feasibility study for cleanup of the JIS landfill in South Brunswick Township. It was based upon the ongoing contamination at the landfill site, the demonstrated unwillingness of JIS to fulfill its responsibilities—especially under the Requirements Document, embodied in the June 27, 1977, order—and the Appellate Division's affirmance of Donald Jones' unfitness to operate a landfill or transfer station. Those facts strongly demonstrated that JIS could not be vested with the responsibility to undertake the ground water cleanup on its own.

## II.

JIS contended that the treble damages provision of the Spill Act violates the due process guarantees of the United States Constitution and the New Jersey Constitution. These contentions parallel those raised in the companion case of *IMO Kimber*. It specifically argued that the treble damages provision of the Spill Act is unconstitutional because it forecloses any judicial relief prior to the imposition of severe penalties.

The standards governing the interpretation of the Spill Act and the application of the Act's treble damages provisions were established by the companion case of *IMO Kimber, supra*. In that case, we determined that the Act's combination of joint and several liability, nearly absolute liability, the virtual elimination of substantive defenses, mandatory treble damages, and no pre-enforcement hearing raised substantial doubt concerning

the Act's constitutionality under the state and federal due process guaranties. We accordingly ruled that modification of the strict statutory provisions would be required to obviate constitutional objections, and would comport with the overall intent and purpose of the Legislature in providing treble damages as part of the enforcement scheme under the Spill Act. We held that (1) a good-cause defense by necessary implication is provided under the treble damages provision of the Spill Act, (2) good-cause defenses include challenges to the reasonableness of the costs assessed, and (3) the DEP has the authority to seek removal costs from dischargers while controlling remedial action and obtain treble damages upon failure to pay such costs. *See id.* 110 *N.J.* at 69.

In this case, we are skeptical that JIS could have successfully mounted a good-cause defense. Such a defense requires that JIS have had an objectively reasonable basis for believing that the DEP directive was either invalid or inapplicable to it. The record of the case belies such an assertion. Nevertheless, we acknowledge that, as in *IMO Kimber*, the petitioning party should have the opportunity to assert a good-cause defense to DEP's directive. That this particular case was settled does not change our analysis since the mere existence of the possibility of the State agreeing to such a settlement does not detract from the fact that it is not obligated to do so. Our holdings today in this case and in *IMO Kimber, supra,* apply to situations where the DEP refuses this option despite the existence of a valid good-cause defense.

Accordingly, we rule that the DEP directive issued to JIS threatening treble damages upon noncompliance does comply with the Spill Act but cannot be enforced as issued. The provisions of the DEP directive ordering the payment of removal costs and threatening treble damages are valid and enforceable subject, however, to any good-cause defense that may be raised by the appellants. The Order of the Court requiring payment of remedial costs by JIS or the provision of security

for such costs under the directive shall be continued so long as the DEP directive remains in force and effect.

WILENTZ, C.J., dissenting.

I disagree with the decision of the majority in this appeal for the reasons expressed in my dissenting opinion in the companion case of *IMO Kimber*, 110 *N.J.* 69, 87 (1988).

*For affirmance as modified*—Justices CLIFFORD, HANDLER, O'HERN, GARIBALDI, and STEIN—5.

*Dissenting*—Chief Justice WILENTZ—1.