240 N.J. Super. 162 (1990)
572 A.2d 1177
IN THE MATTER OF NL INDUSTRIES, INC.
Superior Court of New Jersey, Appellate Division.
Submitted February 7, 1990.
Decided April 17, 1990.
*163 Before Judges KING, BAIME and KEEFE.
Hannoch & Weisman, attorneys for NL Industries, Inc. (A. Patrick Nucciarone, Esq. and Edward F. McTiernan, Esq., on the brief).
Douglas S. Eakeley, Acting Attorney General of New Jersey, attorney for respondent, New Jersey Department of Environmental Protection (Mary C. Jacobson, Deputy Attorney General, of counsel; Richard F. Engel, Deputy Attorney General, on the brief).
The opinion of the court was delivered by KEEFE, J.A.D.
*164 The issue presented is whether appellant, NL Industries, Inc. (NL), filed its claim for damages against the New Jersey Spill Compensation Fund (Spill Fund) within one year of the discovery of damage as required by N.J.S.A. 58:10-23.11k. The Spill Fund Administrator determined that the claim was not timely filed. NL appeals from that determination. Although we are not in full agreement with the Administrator's analysis of the facts presented, we agree with the conclusion reached by him and affirm.
NL is the former owner of property located in Pedricktown, New Jersey. During the time NL owned the property it operated a secondary lead smelting site there. Waste materials were generated at the site which included emission control dust, battery case material, lead smelting slag and battery acid. These materials were also stored at the site.
On October 6, 1982 NL entered into an Administrative Consent Order (ACO) with the New Jersey Department of Environmental Protection (DEP) wherein it agreed to take steps to remediate the hazardous waste conditions that existed at the Pedricktown site and to pay certain fines.
The property was sold to National Smelting Company of New Jersey, Inc. in 1983. In connection with that sale, an amendment to the ACO was entered into on February 10, 1983 between representatives of the DEP, NL, National Smelting and Refining and National Smelting Company of New Jersey.
The Amended Administrative Consent Order (AACO) provided that the original ACO remained in effect and that NL had substantially complied with the provisions of that order. The AACO recognized that responsibility for compliance with the remainder of the ACO was the responsibility of National Smelting Company of New Jersey, with the exception of future "ground water contamination which might emanate from [an existing] secured landfill" which remained NL's responsibility. NL agreed to pay the DEP $600,000 in order to create a fund so *165 that the DEP could perform actions it deemed appropriate to monitor and remedy ground water and surface water problems.
The AACO states in part:
c) The funds paid by NL, and all income thereon, shall be separately maintained for a period of 10 years and shall be administered, invested and expended at the sole discretion of NJDEP to monitor and remedy ground and/or surface water contamination as it nows (sic) exists at the Facility, or as it may exist in the future, in any form and from any source, excluding the secured landfill located at the Facility....
d) It is [the] intention of NJDEP and NL that payment of the funds ... shall constitute a liquidation and payment for all such monitoring and remedial action, the performance of which may be necessary or desirable in the future, and that NL shall have no further duty or obligation with respect to any such monitoring or remedial action, except for that ground water contamination which may emanate from the secured landfill.... NJDEP forever releases and discharges NL from any and all responsibility, obligation and liability relating to the performance of monitoring and remedial action respecting such contamination, under all applicable laws, rules and regulations; NJDEP shall neither commence any action or proceeding against NL with respect thereto nor shall NJDEP take any action to initiate the commencement of any action or proceeding by any other entity against NL with respect thereto. In the event the United States Environmental Protection Agency shall require ground water remedial action at the Facility for those issues which are the subject of this Paragraph (i.e. excluding ground water contamination emanating from the secured landfill), NJDEP agrees to apply the aforedescribed sum to the costs of such remedial action.
Although the United States Environmental Protection Agency (EPA) is mentioned in the AACO, it was not a party to the order.
After the AACO was executed by the parties, but before July 31, 1985, National Smelting Company of New Jersey declared bankruptcy. On that date, NL received a letter from the EPA informing it of the EPA's intention to expend public funds for the investigation of the Pedricktown property and advising NL of its potential liability for those costs pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C.A. §§ 9601-9675. The EPA's letter stated in part:
EPA will immediately move forward with the remedial investigation and feasibility studies (RI/FS) unless you notify EPA in writing BY NO LATER THAN AUGUST 16, 1985 of your intent to undertake the RI/FS.
*166 In the months which followed the EPA letter, a series of discussions and exchange of correspondence took place between NL, EPA and DEP. Those discussions focused on NL's liability for costs associated with a proposed EPA Administrative Consent Order and, more specifically, whether the DEP would release all or some of the $600,000 which it was holding pursuant to the AACO to help fund the RI/FS. Although the record is not completely clear as to the exact date, NL states in its appellate brief that "DEP ultimately declined to apply any of those funds to the RI/FS."[1]
By February 21, 1986 the EPA became insistent that NL decide whether it was or was not going to sign the EPA's proposed consent order. In the letter dated March 21, 1986 addressed to NL, the EPA's regional counsel stated:
The RI/FS needs to get started and EPA cannot debate indefinitely the merits of the language of the proposed Order with NL. NL has had an adequate opportunity to express its views, and EPA has attempted to accommodate NL's legitimate concerns in the revised versions of the Order.
As I told you in our meeting on March 19, 1986, NL now needs to decide whether it will sign the EPA Order and perform the RI/FS. Since we have already received many comments from NL, EPA will at this time only entertain minor revisions to the February 21, draft of the Order, and any suggested revision received by EPA after March 28 will not be considered. If NL wishes to perform the RI/FS, it must sign an EPA-approved Order by no later than April 15, 1986 and deliver the signed Order to EPA by that date. These two deadlines are, of course, the ones I informed you of on March 19.
On April 8, 1986 the EPA extended the deadline for signing its Order to April 21, 1986.
On April 21, 1986 an official of NL signed the Administrative Consent Order as proposed by the EPA. The order outlined the scope and procedures for a remedial investigation and feasibility study at the Pedricktown site. The order was executed by the regional administrator of the EPA on April 25, 1986. The EPA forwarded the executed order to NL on April 28, 1986, advising it that the order was effective on April 30, 1986. The *167 effective date was important because NL was required to perform certain tasks within 90 days of the effective date.
On April 24, 1987 NL mailed its claim for damages against the Spill Fund to the Administrator. NL's request for money from the Spill Fund was denied on February 17, 1989 as being untimely. This denial was followed by an Amplified Damage Claim Denial that explained that at the most N.L.'s claim was approximately one year and six days late, and at the least its claim was six days late. The Administrator determined that NL discovered its damage as early as July 31, 1985, the date the EPA mailed its notification letter to NL, or as late as April 21, 1986, the date NL signed the EPA Administrative Consent Order.
The New Jersey Spill Fund "may be used for six purposes: (1) to finance governmental cleanup of hazardous waste sites; (2) to reimburse third parties for cleanup costs; (3) to compensate third parties for damage resulting from hazardous substance discharges; (4) to pay personnel and equipment costs; (5) to administer the fund itself; and (6) to conduct research." Exxon Corp. v. Hunt, 475 U.S. 355, 375, 106 S.Ct. 1103, 1116, 89 L.Ed.2d 364 (1986). It is for the third stated purpose that NL intended to make application to the Spill Fund. N.J.S.A. 58:10-23.11g. However, any such claim "shall be filed with the administrator not later than 1 year after the date of discovery of damage...." N.J.S.A. 58:10-23.11k. The application is made on forms provided by the Administrator for such purpose. Id.
In this case, the form filed by NL with the Administrator revealed that NL's claimed damage was for the cost of the RI/FS study and for any further remediation liability expense that may result from the RI/FS study. The Administrator made a specific finding as to the damage being claimed by NL in his Amplified Damage Claim Denial.
Specifically, Claimant (NL) is seeking compensation for its percentage of the costs of a Remedial Investigation and Feasibility Study (RI/FS) which resulted from complying with an Administrative Order of Consent entered into with the *168 U.S. Environmental Protection Agency. The amount of this claim is unspecified.
Given the nature of the damage claimed by NL, the Administrator was required to determine when the damage was incurred and the date on which NL learned of it. The Administrator selected alternative dates of July 30, 1985 and April 21, 1986.
We disagree with the Administrator's reliance on the EPA letter of July 30, 1985 as the date on which NL learned that it was damaged by reason of the discharge of hazardous waste. The disagreement stems from our understanding of CERCLA. Under CERCLA when there is a discharge or substantial threat of discharge of any hazardous substance, pollutant or contaminant into the environment which presents an imminent and substantial danger to the public health or welfare, the EPA is authorized to act. One of the actions that it may take is to allow the "owner or operator of the facility" or "any other responsible party" to "conduct the remedial investigation, or conduct the feasibility study in accordance with section 9622 of this title." However, the EPA may not delegate the RI/FS study to such third parties until there is a determination that the party is "qualified to conduct the RI/FS". 42 U.S.C.A. § 9604(a)(1). An owner, operator, or other responsible party who undertakes to do a RI/FS study upon agreement with the EPA is known as a "response action contractor" or a "potentially responsible party." Id. It is clear from the statute that such a contractor neither admits liability nor obtains any benefit from entering into such a consent agreement with EPA. The Act provides.
In no event shall a potentially responsible party be subject to a lesser standard of liability, receive preferential treatment, or in any other way, whether direct or indirect, benefit from any such arrangements as a response action contractor, or as a person hired or retained by such a response action contractor, with respect to the release or facility in question. [Id.]
Thus, it would appear that a consent agreement to perform a RI/FS study is conceptual in nature and a response action contractor does not sustain damage, i.e., incur costs for *169 the study, until it agrees to perform it. We find no provision in CERCLA which permits the EPA to direct a potentially responsible party to perform a RI/FS without the party's consent.[2] Thus, as a matter of law, NL was not damaged on July 30, 1985 when it received the letter from the EPA advising NL that it was a "potentially responsible party" and inviting NL to consider whether it wished to undertake the RI/FS study.
On the other hand, it is clear that NL was damaged and was aware of its damage on April 21, 1986 when it ultimately acceded to the EPA proposal and signed the consent order in the form submitted by the EPA. The letter of transmittal from the EPA to NL with reference to that consent order, dated April 8, 1986, makes it clear that no further room for negotiation was available. NL was required to execute the order by April 21, 1986 or forfeit its right to conduct the study. Therefore, contrary to NL's argument, the execution of the consent order by the EPA on April 25th and the designation of the effective date of April 30, 1986 has no bearing on the date on which NL incurred damage or the date on which it discovered such damage.
In Woodland Private Study Group v. State. of New Jersey, Dep't of Envtl. Protection, 616 F. Supp. 794 (D.N.J. 1985), vacated and remanded with instructions to dismiss as moot, 846 F.2d 921 (3d Cir.1988), the only reported case addressing interpretation of the statute in question, the court found that the date on which plaintiff discovered its damage was March 5, 1985. That was the date on which the DEP issued two directives to members of the plaintiff group and others requiring that they pay the DEP a total of $880,000 within seven days of receipt of the directives for the purpose of funding the costs of a RI/FS. Almost two years prior to that date, plaintiff had *170 entered into negotiations with the DEP concerning the nature of the RI/FS for the site in question and the extent of the DEP's control over the study. In short, negotiations ultimately broke down resulting in the directive of March 5, 1985. Thus, despite plaintiff's knowledge that it was considered to be a potentially responsible party for the clean-up costs as early as August, 1983 and despite the fact that plaintiff offered to undertake the RI/FS study on its own terms, the court found that plaintiff was not damaged until March 5, 1985. In arriving at that conclusion, the court reasoned that it was not until the March 5, 1985 directive that plaintiff was "officially assured" that a claim would be filed against it for the cost of the studies.
The DEP argues that the July 31, 1985 letter from the EPA to NL "is just like a directive." We disagree with that analysis. As noted earlier, the July, 1985 letter issued by the EPA to NL was pursuant to 42 U.S.C.A. § 9604(a). The letter was not a directive at all similar to the DEP directive in Woodland. Rather, it invited NL to undertake the cost of the RI/FS study as a way of mitigating any possible liability for clean-up costs it might ultimately incur. This invitation by the EPA resulted in protracted negotiations which ultimately broke down, resulting in the EPA issuing a non-negotiable consent order which NL was required to sign if it wished to undertake the RI/FS study.
It would appear from Woodland that the DEP took the position that the one-year statute of limitation did not begin to run during the period of negotiations between plaintiff and DEP concerning the RI/FS study. Woodland, 616 F. Supp. at 803. We cannot understand how, under similar circumstances, the DEP can take a different position in this case. The event in the subject case which is comparable to the DEP directive in the Woodland case is NL's capitulation to the EPA demand that it sign the proposed consent order with no further changes. As indicated earlier, that did not occur until April 21, 1986.
In view of our decision that the date of discovery of damage in this case was April 21, 1986, it is unnecessary for us *171 to decide whether NL's claim was "filed" with the Administrator on April 24, 1987 when NL forwarded the claim by certified mail, or April 27, 1987 the date on which the DEP received the form. In either event, NL filed its claim beyond the one-year statute of limitation. We have no authority to expand the time limit contained in the statute. We have in the past upheld the dismissal of a claim for failure to comply with the statute of limitation where the complaint was filed only one day after the running of the statutory period. Leake v. Bullock, 104 N.J. Super. 309, 250 A.2d 27 (App.Div. 1969). See also Cwiklinski v. Burton, 217 N.J. Super. 506, 526 A.2d 271 (App.Div. 1987).
Affirmed.
NOTES
[1] NL's brief refers to a letter contained in the appendix from DEP to NL dated February 20, 1986.
[2] Of course once liability is established pursuant to the statute, a responsible party is liable for all costs of removal or remediation and any other costs of response incurred as a result thereof. 42 U.S.C.A. § 9607(a).