583 A.2d 739

CARLO BUONVIAGGIO AND MILDRED F. BUONVIAGGIO, APPELLANTS-APPELLANTS, v. THE HILLSBOROUGH TOWNSHIP COMMITTEE, RESPONDENT, AND STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, RESPONDENT-RESPONDENT.

Argued September 24, 1990—Decided January 7, 1991.

*R. Dale Winget* argued the cause for appellants.

*R. Brian McLaughlin,* Deputy Attorney General, argued the cause for respondent (*Robert J. Del Tufo,* Attorney General of

New Jersey; *Mary C. Jacobson,* Deputy Attorney General, of counsel).

The opinion of the Court was delivered by

O'HERN, J.

This appeal requires us to resolve a controversy about application of the one-year time bar set forth in the New Jersey Spill Compensation and Control Act (the Act), which requires that claims against the Spill Fund be filed not later than one year after the date of "discovery of damage." *N.J.S.A.* 58:10–23.-11k. The case arises in the context of the pollution of a farmer's well by a distant chemical spill. The legal principles are familiar. We accept a recent Appellate Division statement of them:

> Neither the legislative history nor any reported cases [on the Spill Fund] discuss the meaning of "discovery of damage." *But see In the Matter of NL Industries, Inc.,* 240 *N.J.Super.* 162, 572 *A.*2d 1177 (App.Div.1990) (determining when "damage" in fact occurred). However, an extensive body of New Jersey case law has established and defined our "discovery rule," under which accrual of a cause of action is delayed " 'until the injured party discovers, or by the exercise of reasonable diligence and intelligence should have discovered[,] that he may have a basis for an actionable claim.' " *Vispisiano v. Ashland Chemical Co.,* 107 *N.J.* 416, 419, 527 *A.*2d 66 (1987) (quoting *Viviano v. CBS, Inc.,* 101 *N.J.* 538, 546, 503 *A.*2d 296 (1986), quoting *Lopez v. Swyer,* 62 *N.J.* 267, 272, 300 *A.*2d 563 (1973)). We think it fair to infer that the Legislature contemplated that "discovery rule" principles would be applicable in determining "the date of discovery of damage." [*Enertron Indus., Inc. v. Mack,* 242 *N.J.Super.* 83, 90, 576 *A.*2d 28 (App.Div.1990).]

Some history provides background for the issues. The New Jersey Spill Fund was a pioneering effort by government to provide the monies for a swift and sure response to environmental contamination. Since New Jersey's enactment, many states have followed suit and the federal government has enacted a so-called "Superfund" under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 *U.S.C.A.* §§ 9601–9675 (West Supp.1990).

The impetus for the New Jersey Spill Fund arose from the specter of massive contamination from an offshore oil spill.

Still feeling the effects of the earlier Arab oil embargo, major oil companies contemplated supertanker ports and exploratory drilling off the coast of New Jersey. McCarter, "New Jersey Clean Up Your 'Act': Some Reflections on the Spill Compensation and Control Act," 38 *Rutgers L.Rev.* 637, 642 (1986). The New Jersey tourist industry dreaded a massive oil spill that could seriously damage the beaches and waterways of the state. The recent spills in Prince William Sound, involving the *Exxon Valdez,* and in our Arthur Kill are more recent examples of the feared environmental devastation.

In response to this fear, the Legislature enacted the "Spill Compensation and Control Act," *L.*1976, *c.* 141 (codified as amended at *N.J.S.A.* 58:10–23.11 to –23.24), with the express intent to "prohibit[ ] the discharge of petroleum and other hazardous substances into New Jersey waters and provide[ ] for the cleanup of any such discharge * * *. [The Act] addresses the dangers posed to the coastal environment by the imminence of offshore drilling." Sponsor's Statement to S.1796, *L.*1976, *c.* 141.

A key feature of this Act is the establishment of a revolving fund known as the Spill Fund. *N.J.S.A.* 58:10–23.11i. The purpose of the Spill Fund is to finance the prevention and cleanup of oil spills and hazardous-waste discharges and to compensate resort businesses and other people damaged by such discharges. *N.J.S.A.* 58:10–23.11a. As originally enacted, the Spill Fund raised revenues by taxing the first transfer of petroleum or petroleum products in the state and any transfers between major facilities, while non-petroleum hazardous substances were taxed only at the first transfer, *N.J.S.A.* 58:10–23.11h (as amended), again reflecting the primary concern of the Legislature with a massive oil spill. This Spill Fund is "strictly liable" for all cleanup and removal costs and for all direct and indirect damages resulting from a discharge. *N.J.S.A.* 58:10–23.11g.

The Spill Fund originally adopted a prospective approach to environmental spills, providing a kind of insurance policy against possible disaster. A swift and sure governmental response would be required if there should be a spill from a massive source. In this setting, the role of the New Jersey Department of Environmental Protection (DEP) was clear—protector, preserver, and restorer. The DEP was to provide the direction for an effective cleanup. It could tap the Spill Fund for deployment of booms, detergents, and other necessary cleanup supplies.

Although the DEP assumed the role of manager for purposes of operation and implementation, the Administrator of the Spill Fund, who is the official authorized to make disbursements from that Fund, was a functionary within the Department of Treasury. Inevitably, tensions of administration arose.

Within just a short time of the Spill Fund's enactment, a fuller appreciation of the extent of toxic pollution began to emerge. The disasters at Love Canal in New York and at the Kin Buc Landfill in New Jersey were among the catalysts for increased concern. Long-buried chemical wastes had spread from their deposit sites to contaminate underground water supplies and to invade even the air. The cruder threat of the spreading oil slick was displaced as the primary concern by the vastly more complex hazard posed by the unseen and unknown contamination of natural resources. The Spill Fund needed to assume a broader scope and to be more efficiently administered if it was to cope with these new threats to the environment.

Our Legislature reacted promptly. In 1979, it broadened the Spill Fund's tax base to include transfers of non-petroleum hazardous substances whenever transferred between major facilities. *N.J.S.A.* 58:10–23.11h (as amended). The amendments also created two rates of taxation for petroleum and non-petroleum hazardous substances. Petroleum products continued to be taxed at a rate of one cent per barrel transferred, while the transfer of non-petroleum hazardous substances was taxed at a

rate of one cent per barrel or one percent of the fair market value of the product, whichever was greater. The Spill Fund was also authorized to be used to clean up discharges that occurred before the enactment of the Act. *N.J.S.A.* 58:10–23.-11f(b)(3). In addition, the requirement that claims be filed within six years of the date of the incident causing damage was deleted (presumably to permit recovery by those suffering loss from long-hidden contamination), although the one-year date-of-discovery limitation remained. *N.J.S.A.* 58:10–23.11k (as amended by *L.*1984, *c.* 142, § 3).

In 1985, the administration of the Spill Fund was shifted from the Department of the Treasury to the DEP. *N.J.S.A.* 58:10–23.11i (as amended by *L.*1985, *c.* 115, § 3). Of course, the DEP continued its managerial role under which it must quickly deploy entrusted public funds to restore the environment and abate damages. But now the DEP assumed a second role, a more defensive one, as keeper of the public purse. Today, the DEP must seek to fulfill both these roles in the face of complex and sometimes protracted environmental cleanups.

*In re Kimber Petroleum Corp.*, 110 *N.J.* 69, 539 *A.*2d 1181 (1988), and *In re J.I.S. Industrial Service Co. Landfill*, 110 *N.J.* 101, 539 *A.*2d 1197 (1988), illustrate the newer methods for the Spill Fund's administration. In those cases, subsurface deposits or stored chemicals leaked into underground water supplies and spread to distant areas of the community. In the *J.I.S.* case, the DEP exerted its extraordinary administrative powers under the Spill Fund to order a suspected polluter to pay for a remedial investigation and feasibility study (RI/FS) for cleanup of a landfill. 110 *N.J.* at 111, 539 *A.*2d 1197. That case, like this one, involved the provision of an alternative water supply. Similarly, in *Kimber,* the DEP, pursuant to its "broad implied powers" under the Act, ordered the defendants to fund the construction of an alternative water supply for affected residents. 110 *N.J.* at 74, 539 *A.*2d 1181.

At one end of the spectrum of complexity is massive multi-party litigation involving cleanup of large sites. Such cases involve the interplay between the administration of the Superfund under CERCLA and our own Spill Fund, private litigants' suits, and sometimes actions in the bankruptcy courts. *See New Jersey Dep't of Envtl. Protection v. Gloucester Envtl. Management Servs., Inc.*, 719 *F.Supp.* 325, 330 (D.N.J.1989) (environmental case in federal court involving "hundreds of parties").

This case presents a much less complex, but nonetheless far from simple, case for application of the nineteen words of the statute of limitations under the Spill Fund: "Claims shall be filed with the administrator not later than one year after the date of discovery of damage." *N.J.S.A.* 58:10–23.11k. In addition to analyzing the effect of the dual-office function held by the DEP, we must assess the effect of the additional overlay of the municipal government, which acted both as a regulator of the environment (it threatened the homeowner with penal consequences for failure to seal a private well) and as an advocate for its citizens by negotiating with the DEP over the nature and extent of the pollution and thereby the determination of the damage caused by the polluter. Additionally, the federal government played a peripheral role in this controversy.

Because no hearing took place before the Administrator of the Fund, we must seek to extrapolate the facts from various documents and representations of the parties. The Buonviaggios own a five-acre tract along the Raritan River in Hillsborough Township on which they maintain their residence and a nursery business. (The title to the farm was apparently held by Mrs. Buonviaggio. Because both spouses are plaintiffs, we need not determine their separate interests.) Sometime before the summer of 1984, the United States Environmental Protection Agency (EPA) determined that a farm in the Buonviaggios' vicinity (the Krysowaty farm) had been the site of the improper disposal of hazardous waste. The waste had permeated the underground water supply and posed a threat even to distant

properties. In addition, excavation of the toxic waste could release additional pollutants into the environment. As it turned out, the Buonviaggios had the regrettable misfortune of being on the outer edge of an area that might have been affected by the subsurface contamination of ground water emanating from the Krysowaty farm. In the summer of 1984, the EPA alerted the community to the possible danger. The residents were at first skeptical of the premise that their wells were contaminated. The governing body of Hillsborough, however, determined to end the debate by extending its public water supply to the affected area. (Jackson Township took similar action to remedy contamination of its residents' wells. *Ayers v. Jackson Township,* 106 *N.J.* 557, 525 *A.*2d 287 (1987).) The original area to be served by the proposed public water supply did not include the Buonviaggios' farm.

Hillsborough finally secured EPA financing for the project after years of seeking help from the DEP. In the words of the municipal attorney, "[t]his is not to say that the N.J. DEP did not cooperate in securing the ultimate clean-up of the site, but only that Hillsborough had to find the financing through the U.S. EPA." Apparently, the DEP later provided money from the Spill Fund when the federal funds proved insufficient to complete the cleanup. The EPA insisted that prior to cleanup of the site, the affected residences had to be connected to the public water supply and the Hillsborough Township Board of Health (the Board) had to adopt a mandatory connection ordinance to insure compliance. (Although they are separate entities, because of the identity of interest we refer interchangeably to Hillsborough and the Board.) The DEP, however, was to designate the affected zone.

Initially, the DEP, as the EPA had done, designated an area that did not include the Buonviaggios' farm. At the first public reading of the proposed connection ordinance, however, the Board learned that the DEP had changed its position and now called for a larger area, including the Buonviaggios' farm. In the words of the municipal attorney, "the experts spoke of the

'potential' impacted area, but never spoke to actual facts which would support on a concrete basis hazardous infiltration of the wells to be condemned."

The Board reluctantly acceded to the new designation and passed the connection ordinance in question. However, the municipal attorney wrote to the DEP, stating that the ordinance "suffered from questionable enforcement value" because of the problems of proof with respect to whether the Buonviaggios' farm was in fact affected.

To nail the issues down and forestall a challenge to the ordinance, the Hillsborough officials presented the Buonviaggios with three alternatives: (1) to seal the private well and use public water only, thus achieving total ordinance compliance; (2) to seal the private well and use public water for the house and a river water device for the farm; (3) to retain the well and use public water for the house and well water for the business with protective devices and periodic monitoring.

The Buonviaggios were reluctant to accept the first alternative. Their concern stemmed from the fact that their farm is a horticultural farm, which requires extensive amounts of water. Use of the municipal water-supply system would make operation of the nursery prohibitively expensive. The DEP was reluctant to accept the third alternative. The second alternative required additional money and permits. In its February 12, 1986, letter to the DEP, the Board asked the DEP to allow Hillsborough to honor a previous commitment to the Buonviaggios and to help it with the funding of the alternative water supply for the nursery stock.

Meanwhile, Hillsborough wanted to get on with the construction of the public water supply system. It negotiated an interim arrangement with the Buonviaggios allowing the town entry to connect the town water supply but left the other damages to be resolved. Thus, on July 25, 1986, the Buonviaggios executed a right-of-entry agreement, to be submitted to the DEP, which provided for the installation of the public

water extension, the sealing of the existing water well, and satisfactory assurance that no claim against the validity of the ordinance would be made. Their attorney's letter of transmittal to Hillsborough, dated July 25, 1986, recited that "[a]t the time of public hearings on the closing of the wells the DEP representatives indicated that they would work to compensate citizens who suffered special losses, such as [the Buonviaggios]. We have been waiting all this time to effect a satisfactory resolution of this problem," and that the agreement was expressly delivered to the municipality "in a spirit of cooperation, and without prejudice to any rights [Mrs. Buonviaggio] may have to pursue a claim under the 'Spill Act' or otherwise on account of damages to her property and business as a consequence of the sealing of her well." A letter from the Buonviaggios' attorney, dated October 29, 1986, states that "we had left the question of the alternate supply (such as a pump in the river) to be resolved." That letter included the statement that "[i]f I recall correctly, the State had been the moving force for a settlement of our dispute which would provide for an alternate water supply for my clients' nursery irrigation requirements."

The administrative record does not disclose exactly what happened over the intervening months. Hillsborough's Health Officer reports that between November 1986 and May 1987 he held "several meetings with representatives of [the] New Jersey Spill Fund regarding surface water irrigation system. *Finally* directed to submit a claim with all documentation." (Emphasis added.) The Buonviaggios contend that their damages were actually incurred, then, on June 18, 1987, when the Elizabethtown Water Company, the contractor installing the public water line under the EPA funding, appeared on their property to turn off the well. If the well were shut down, the Buonviaggios would be unable to water their nursery stock and would likely suffer substantial damages. It was then that the Board presented them with a claim form to be submitted to the

Spill Fund. The Buonviaggios actually submitted the claim to the Township. The Board's letter to the DEP states:

It is Mr. & Mrs. Buonviaggio's position[,] supported by Hillsborough Township[,] that the unique circumstances of their situation validate their claim to the Spill Fund for replacement of their irrigation system with the proposed surface water alternative supply system. They maintain that using the public water supply for irrigation would be prohibitively expensive and an undue hardship.

The Administrator of the Spill Fund rejected the claim on January 29, 1988, concluding that it was untimely filed, being "later than one year from the date of discovery of damage." In support of his letter findings, the Administrator relied on an October 30, 1985, letter from Dr. Jorge Berkowitz of the DEP notifying the Buonviaggios that Hillsborough had enacted its municipal water-connection ordinance and on the right-of-entry agreement that the Buonviaggios had signed on July 25, 1986.

The Appellate Division, in an unpublished opinion, affirmed the Administrator's disposition, concluding that the Buonviaggios had had reason to know they had suffered damage no later than October 30, 1985, the date of Dr. Berkowitz's letter. We granted certification. 117 *N.J.* 650, 569 *A.*2d 1346 (1989).

We agree that it is a difficult role for the DEP to act both as the protector of the environment and as the conservator of the Spill Fund. This case presents a small but thorny conundrum because no one knows whether the Krysowaty pollution actually contaminated the Buonviaggios' source of water.

How does one determine in this context, then, when the damage occurred and what the damages are? Do the damages consist of the spread of pollution to the well, or do they consist of the economic losses incurred when the alternative water supply was not provided? Certainly, damage did not necessarily occur when Dr. Berkowitz informed the Buonviaggios that Hillsborough Township had enacted a public water supply ordinance. The Buonviaggios questioned the validity of the ordinance. All parties appeared to be proceeding in a spirit of cooperation. The EPA, the DEP, the Board, and the Buon-

viaggios were trying to find the most acceptable solution. On the other hand, the DEP had the undoubted capacity to remedy what it had described as "possible" damage to the environment when it included the Buonviaggios' farm in the designated area.

An analogous case is *In re NL Industries, Inc.*, 240 *N.J.Super.* 162, 572 *A.*2d 1177 (App.Div.1990), in which a property owner received a written proposal from the EPA that the property owner prepare an RI/FS to rid its property of environmental waste. Without necessarily endorsing the specific findings or holdings in that case, we agree with the court's observation that early negotiations concerning an environmental responsibility do not necessarily indicate the "discovery of damages" that triggers the Spill Fund's statute of limitations. That court determined that the damages had occurred when "negotiations ultimately broke down" and the property owner was "officially assured" that a claim would be filed against it. *Id.* at 170, 572 *A.*2d 1177. The question we must answer is similar: when was the property owner "officially assured" that there were to be no more negotiations and that the damages were fixed?

We acknowledge that "discovery of damage" is a very difficult concept to apply when the definition of damage is a moving target within the administrative control of the party resisting the claim. *See Woodland Private Study Group v. State of N.J. Dep't of Envtl. Protection*, 616 *F.Supp.* 794, 803 (D.N.J.1985) (DEP takes position that one-year period of limitations did not begin to run during negotiations between subject and DEP), *vacated as moot*, 846 *F.*2d 921 (3d Cir.1988). The DEP determined the geographic scope of the Hillsborough ordinance. It could also determine the damages. The Buonviaggios certainly suffered damage when the DEP made its final determination regarding what it would do to remedy the environmental damage in its role as protector of the environment.

In the context of this case, allowing the Buonviaggios to present a claim does no more than recognize the simple justice

in the situation. A similar approach was taken in *Peloso v. Hartford Fire Insurance Co.*, 56 *N.J.* 514, 267 *A.*2d 498 (1970), which involved the effect of a limitation-of-action provision on a party actively engaged in the claims-negotiation process. That Court held that the period of limitation was tolled "from the time an insured gives notice until liability is formally declined." *Id.* at 521, 267 *A.*2d 498. The Court concluded:

We think this approach is more satisfactory, and more easily applied, than the pursuit of the concepts of waiver and estoppel in each of the many factual patterns which may arise. [*Ibid.*]

We recognize that the application of waiver or estoppel principles to government actions is to be most strictly limited. *See W.V. Pangborne & Co. v. N.J. Dep't of Transp.*, 116 *N.J.* 543, 562 *A.*2d 222 (1989). Although no principles of waiver or estoppel demanded the result, the Court held that recognition of a statute-of-limitations defense in the circumstances in *Pangborne* would have been inconsistent with underlying legislative goals and public-policy considerations. There we said that while an authorized claims process was continuing, a party should not be penalized for not instituting suit. *Id.* at 562, 562 *A.*2d 222. We noted that the State was free to enact express provisions in its regulations regarding the intended consequences of a particular course of action. *Ibid.*

As in *Pangborne*, our holding does not "unduly fetter or interfere with" the discretion of the DEP. *Id.* at 563, 562 *A.*2d 222. It can insist on dual-track processing of potential claims through the Spill Fund. No more is required than that the DEP make clear to members of the public whether and when assertion of a claim against the Spill Fund is required despite ongoing negotiations.

In the absence of such clear instruction, we conclude that allowing this claim comports with both the legislative goals and public-policy considerations. *See id.* at 562, 562 *A.*2d 222. After all, the ultimate legislative goal is to clean up the environmental damage caused by the Krysowaty farm. How does an environmental remediation system best accomplish that legisla-

tive goal? If a claim against the Spill Fund were barred, the Buonviaggios' only alternative would be a direct suit against the polluter. Undoubtedly, the defense would be that there was no pollution, that the plaintiff had suffered no damages, and that, at most, the well-intentioned but misguided actions of government had caused the Buonviaggios' losses. Does that really accomplish the goals of the Legislature? We must assume that the RI/FS was funded either by the Spill Fund or directly by the Krysowaty polluters. We may also assume (considering the $700,000 cost of the RI/FS in *J.I.S.*, *supra*, 110 *N.J.* at 103, 539 *A.*2d 1197) that that claim vastly exceeds the $7,000 needed to put in a river-water well for the Buonviaggios. Does it not follow that a single suit by the DEP against the polluter or polluters would be the best way to proceed in light of limited environmental and judicial resources?

We recognize that "[l]egislatures have to draw lines when passing socially remedial legislation or nothing would get done." *Atlantic City Mun. Utils. Auth. v. Hunt*, 210 *N.J.Super.* 76, 99, 509 *A.*2d 225 (App.Div.1986). We say only that the line must be drawn with a reasonable degree of predictability. In this case, there is a special sense of unpredictability because the DEP had, without requiring claim forms, remediated the damages of all the other property owners (albeit not damaged in the same way as the Buonviaggios); the DEP had continually negotiated with the Township, even more than one year after the Berkowitz letter, about remediating the Buonviaggios' damages; and the DEP always had the power to remedy the situation itself, whether or not a claim form was filed.

We express no opinion on the merits of the Buonviaggios' claim. The DEP is in the best position to assess the extent of any economic loss resulting from the action of the Krysowaty farm polluters. The DEP has conducted the environmental studies in this area, and it can best determine what the polluters should pay to remedy the damages they have caused.

To sum up, in this disposition there is no estoppel against government, nor is there a waiver of the statute-of-limitations

defense. Rather, the Buonviaggios lacked clear instructions or regulations defining when claims for threatened damages must be filed under the Spill Fund. In this case, we believe that the damages claimed, the economic losses occasioned by pollution from a distant source, did not become final or fixed until the DEP established that it would not correct the environmental damage with the available resources and that a claim against the Spill Fund would have to be made. The conclusion that seems so clear to our dissenting members now, must have been far from obvious then. For if the matter were as straightforward as the dissent would make it, we would have to confront the fact that the DEP (possessed of the same knowledge the Buonviaggios had) was actually encouraging the plaintiffs to submit a claim to the Spill Fund at a time when their rights had expired. Of course, the DEP would never subject a member of the public to so futile an effort just to exercise the formality of declaring the claim out of time. Rather, the DEP must have perceived, as do we, that in the circumstances of this case, the claim was neither stale nor untimely.

On this record, then, where the citizens perceived the DEP to be acting as both an affirmative remediator of potential damages as well as the defensive shield of the Spill Fund, injustice is avoided by ruling that the damages were not sustained until the cooperative effort stopped and the Buonviaggios' damages were imminent.

The judgment of the Appellate Division is reversed and the matter remanded to the Department of Environmental Protection for further proceedings under the Spill Act. Our resolution of the legal issues is on the basis of the record before us. There may be other factual or legal issues that will have to be resolved under the Spill Act.

CLIFFORD, J., dissenting.

This appeal presents a statute-of-limitations question: did appellants file their claim within one year of their "discovery of

damages," as required by *N.J.S.A.* 58:10–23.11k? The administrative agency and the Appellate Division both held, as would I, that the claim was time-barred.

No matter how we dramatize the underlying lawsuit, the fact remains that the case does not project a clash of opposing policy considerations in the field of environmental law, and most assuredly it does not require us to come to grips, as the Court purports to do, with the portentous issue of "[h]ow * * * an environmental remediation system best accomplish[es]" the "clean up [of] the environmental damage caused by the Krysowaty Farm." *Ante* at 17, 583 *A.2d* at 745. What it *does* require is that we faithfully implement the legislative directive imposing a limitation of one year from the discovery of damage for filing claims against the Spill Fund.

Appellants filed their claim on September 25, 1987. The brannigan over the Krysowaty Farm's threat to neighboring water supplies had erupted in 1982. Appellants and their neighbors, numbering about one hundred, had petitioned government officials to clean up the site and had voiced opposition to the installation of an alternative water supply for the area. On October 30, 1985—almost two years before appellants filed their claim, and the date no later than which both the Spill Fund Administrator and the Appellate Division concluded that appellants had discovered their damage—Dr. Jorge Berkowitz, Administrator of Hazardous Site Mitigation in the Department of Environmental Protection (DEP), told the Buonviaggios by letter that Hillsborough Township had enacted the "Krysowaty Farm Mandatory Water Connection Ordinance," effective October 17, 1985. Because the ordinance declared appellants' property to be a danger to health and welfare due to the threat of contamination, appellants were prohibited from using their well water. Dr. Berkowitz's letter further informed appellants that the ordinance required them to connect their property to municipal water lines and to seal their private well, and that the hook-up and installation could be done cost-free if the Buonviaggios made the necessary arrangements with DEP by No-

vember 4, 1985, but that after that date appellants would have to bear the cost.

The Buonviaggios therefore knew, on October 30, 1985, that their well had to be sealed. And they knew that the cost of operating their business with the alternative water supply was more than they could stand, which is why they wanted DEP and Hillsborough to provide a pumping system to draw water from the contiguous Raritan River. That sounds like "damage" to me. Appellants may not have known the extent of that damage as of October 30th, but as the Appellate Division pointed out, "a statute of limitations runs from the date that a plaintiff has actual or imputed knowledge that an actionable claim exists, not from the date on which the claimant has knowledge of the extent of his damages." Nor should the fact that negotiations with DEP continued after October 30th affect the result. Again as the Appellate Division correctly observed:

> DEP's willingness to engage in discussion with plaintiffs' counsel concerning an alternative water supply to meet their peculiar needs should not work to DEP's disadvantage. There is no proof in this case that DEP, at any time, committed to the proposal made by plaintiffs or that it acted in bad faith in stringing plaintiffs along until the statute ran. * * * We find no conduct on the part of any DEP employee which justifies the invocation of estoppel.

To suggest, as I think the Court does, *ante* at 16, 583 *A.*2d at 744, that appellants did not discover their damage, for purposes of the Spill Fund Act's time limitation, until DEP "made its final determination on what it would do to remedy the environmental damage" makes little sense. As the Attorney General asserts,

> [w]ere all Spill Fund claimants to be afforded a nearly unlimited option to hold off on filing their claims until they were satisfied that remedial efforts were proceeding in accordance with their unique desires, the Spill Act's statute of limitations would offer virtually no repose for untimely claims and would exhaust the decidedly finite resources of the Spill Fund. As the Appellate Division recognized in *Atlantic City Municipal Utilities Authority v. Hunt,* 210 *N.J.Super.* 76, 99 [509 *A.*2d 225] (App.Div.1986), "Legislatures have to draw lines when passing socially remedial legislation or nothing would get done * * *. The fund created by the [Spill Act] is finite, and the effects of hazardous discharges, while not infinite, are prolonged and unpredictable in nature."

Because I am reluctant to complicate matters by investing with esoteric properties the concept of "damage" as used in the Spill Fund Act, I would affirm.

Justice POLLOCK joins in this dissent.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices HANDLER, O'HERN, GARIBALDI and STEIN—5.

*For affirmance*—Justices CLIFFORD and POLLOCK—2.